**NORWEST CAPITAL MANAGEMENT & TRUST COMPANY as Administrator of the Estate of Louis M. Altringer, Deceased, Appellant,**

**v.**

**UNITED STATES of America, Appellee.**

**Nos. 86–5267, 86–5268.**

United States Court of Appeals, Eighth Circuit.

Submitted March 11, 1987.

Decided Sept. 18, 1987.

Dennis Hill, Rapid City, S.D., for appellant Bobbie F. Largent.

Patrick M. Ginsbach, Hot Springs, S.D., for appellant Norwest Capital Management & Trust Co.

Tara C. Neda, Dept. of Justice, Washington, D.C., for appellee.

Before LAY, Chief Judge, FLOYD R. GIBSON, Senior Circuit Judge, and JOHN R. GIBSON, Circuit Judge.

LAY, Chief Judge.

This federal tort claim suit arises out of the February 13, 1980, crash of a twin engine airplane near Hot Springs, South Dakota. The airplane, owned and piloted by Charles M. Largent, crashed shortly after takeoff from the Hot Springs airport with three passengers aboard, one of whom was Louis Altringer, a business associate of Largent. All aboard the plane were killed. The estates of Largent and Altringer brought this action against the United States, alleging that the government negligently failed to warn Largent of adverse weather conditions that led to structural icing causing the plane to crash.

The district court[1] found that the government was negligent but that icing did not cause the crash and entered judgment for the United States. The court also found that Largent was contributorily negligent and that his negligence was more than slight, barring his claim under the South Dakota comparative negligence statute. *See* S.D.Codified Laws Ann. § 20–9–2 (1979). It further found that Altringer was engaged in a joint enterprise with Largent in the operation of the aircraft, thus barring Altringer's claim through the doctrine of imputed contributory negligence. The estates of Largent and Altringer appeal.

**Facts**

Charles Largent was the president, manager, and a shareholder of Fall River Feedlots, Inc., a corporation headquartered in Hot Springs, South Dakota. Louis Altringer was the assistant manager and a share-

---

1. The Honorable Andrew W. Bogue, Senior Judge, United States District Court for the District of South Dakota, presiding.

holder of Fall River Feedlots. On February 13, 1980, Largent, Altringer, and two officers of the First National Bank of Hot Springs planned to fly in Largent's twin engine Beech Baron aircraft from Hot Springs to Modesto, California, to inspect some cattle.

### Government Negligence

At 4:16 a.m., Mountain Standard Time, from his home in Hot Springs, Largent telephoned the Flight Service Station (FSS) in Rapid City, South Dakota, and spoke with FSS Specialist Charles Shields. An FSS is a Federal Aviation Administration air traffic facility that provides services to airmen such as weather briefings, receiving and processing flight plans, and communicating with airborne aircraft. Because Hot Springs had no FSS facility, it was the practice of Hot Springs pilots to telephone the Rapid City FSS to obtain weather briefings and flight clearances and to file flight plans.

Largent identified himself to Shields as Baron 8592R, informed Shields that he would be departing from Hot Springs at 6:00 a.m. destination Modesto via Casper, Rock Springs, Salt Lake City, and Reno, and asked for a weather briefing. Shields gave Largent general weather information such as cloud densities and ceilings at all points along Largent's intended route. Largent also asked for and was provided with winds aloft information. Largent then filed his flight plan (it is customary to do this over the phone), Hot Springs direct to Casper direct to Rock Springs, and requested an altitude of 8,000 feet mean sea level (MSL). At the end of the fifteen-minute conversation, Shields informed Largent that Rapid City had been IFR (Instrument Flight Rules, i.e., overcast) all night, and the cloud ceiling had dropped to about 700 feet within the last three hours. Largent informed Shields he would call again just before takeoff to get a clearance void.

Shields *did not* inform Largent of an area forecast that warned of icing over South Dakota and eastern Wyoming.

Shields testified that this forecast had been issued at 5:40 p.m. on February 12 and would expire at 6:00 a.m. on the thirteenth; thus, he believed it was no longer accurate. Shields knew that Largent would be calling back at 6:00 a.m., just before departure, and he thought he would have a new forecast by then. If icing was still forecast, he could inform Largent of these conditions at that time.[2]

However, when Largent again called Rapid City FSS just before 6:07 a.m., he did not speak with Shields but with specialist Paul Kasen, who had come on duty just two minutes before. Kasen did not know that Shields had postponed warning Largent of the icing forecast. Largent requested his flight clearance and after receiving it, asked Kasen, "What have you got up there?" Kasen informed Largent that Rapid City had light snow showers with broken clouds at 700 feet, overcast at 3,000 feet, and visibility of three miles. Largent also asked for conditions in Casper and Rock Springs. Kasen gave a statement to investigators that he observed in the FSS pre-flight briefing log that Shields earlier had given Largent a complete weather briefing and that Kasen therefore only provided the information specifically requested.

The district court found that Shields was negligent, but that Kasen was not. The court noted that the FSS handbook does not permit specialists to amend forecasts, which is essentially what Shields did by disregarding the icing forecast. The court also found that Kasen was not negligent because Largent informed Kasen that he was calling for a takeoff clearance and did not mention a weather briefing.

The record reveals that at 5:40 on the morning of the flight, the National Weather Service issued a Kansas City area forecast, which covered Largent's route of flight. The forecast was effective from 6:00 a.m. to midnight of February 13, and called for moderate mixed icing in the clouds over southwestern South Dakota

---

**2.** Shields testified: "I did not give the flight precautions because the area forecast was over ten hours old and I think in my deposition they asked me that when Mr. Largent called back would I have given the flight precaution. I think I said possibly."

and generally deteriorating weather conditions through the morning hours. It is unclear exactly when this forecast was received at the Rapid City FSS, but Shields testified that it should have been received at 6:00 a.m. Had it not been received at this time, he stated, it would have come in on a teletype scan at 6:40 a.m. The government's expert meteorologist testified that at this time, the National Weather Service was converting to a new communications system, occasionally causing delayed transmissions. There is no evidence of whether Rapid City FSS received the new forecast at 6:00 a.m. It is not disputed that Kasen did not give Largent the new icing forecast.

■ The district court declined to speculate as to whether Kasen had received the updated forecast by the time Largent spoke to him. The court found that Kasen was under no duty to give Largent another weather briefing under the guidelines in the FSS handbook because "Largent was calling for his clearance, and not a weather briefing." We deem this finding clearly erroneous. The facts are undisputed that after receiving his clearance, Largent specifically inquired into weather conditions along his route of flight by asking Kasen, "What have you got up there?" Kasen understood this question to be weather-related as indicated by his answer, "Oh we've got the sky partially obscured estimated seven hundred broken three thousand overcast three miles. Light snow showers." Largent then asked for conditions reported in Casper and Rock Springs and asked Kasen to recheck winds aloft at 9000 feet. By inquiring into these weather conditions, Largent went beyond a mere request for clearance, as the district court characterizes the conversation with Kasen, and thus imposed an additional duty upon Kasen to provide him with pertinent weather conditions relative to his flight, especially adverse and potentially dangerous conditions such as icing.

■ Whether Kasen had received the updated forecast from Kansas City is immaterial. He knew by looking at the briefing log that if Shields did convey to Largent

the icing forecast, that forecast was ten hours old at the time Largent would have received it. He also knew that Kansas City would have issued a new forecast twenty-five minutes before his conversation with Largent. Kasen knew the old forecast was to expire at 6:00 a.m. that morning. Had Kasen been exercising due care, Largent's request for further weather information should have prompted Kasen to at least report in full the old forecast including icing warnings and to ascertain whether the old forecast which expired at 6:00 a.m. had been updated. Kasen must have known that the weather conditions had been deteriorating in the area. The Sixth Circuit has held that "[s]ince the FAA has undertaken to advise requesting pilots of weather conditions, thus engendering reliance on facilities such as the Indianapolis FSS, it is under a duty to see that the information which it furnishes is accurate and complete." *Pierce v. United States*, 679 F.2d 617, 621 (6th Cir.1982). Complete information means current information. Even had the updated forecast not been received in Rapid City, a simple telephone call by Kasen to the weather service would have provided him with the updated forecast. We hold that the district court's finding that Kasen was not negligent is clearly erroneous. Both Shields and Kasen as flight service specialists were grossly negligent in failing to provide Largent with accurate weather information. The evidence is undisputed that the government agents deprived Largent from having the correct weather information so as to allow him to make the critical judgment as to whether to fly the plane into icing conditions. If the proper forecast of current icing conditions had been given to Largent it is beyond speculation that he would have chosen not to take off in an aircraft that was not equipped with de-icer equipment.

**Largent's Negligence**

■ The government contends, and the district court alternatively found, that even if icing could be found to have caused this crash, Largent as pilot of the aircraft was guilty of more than slight negligence when compared with the negligence of the

government. Defendant's expert witness, Bernard Coogan, testified that one of the most basic lessons given to pilots learning to fly IFR is to recognize and be alert to conditions under which icing is likely to occur. Two conditions must exist for icing to occur: (1) the aircraft must be flying through visible moisture such as rain or clouds; and (2) the temperature must be below freezing. Given the conditions at Hot Springs that morning—low overcast, temperature in the twenties Farenheit, and very light snow—Coogan stated that although he would expect to be told of an icing forecast by the FSS specialist, if no mention was made of icing, he would have asked if icing was forecast. Even without such a forecast or pilot reports of icing, Coogan asserted that the phenomenon can still occur and a careful pilot would plan for it.

Coogan did not believe Largent asked Shields for the information necessary to make an informed decision as to whether he faced a "go or no go" situation. For instance, Largent did not ask Shields for "tops," maximum cloud heights, which are important to know if one encounters icing. According to Coogan, if a pilot flies into an icing situation and he knows the tops, he can sometimes continue his climb and get out of the danger zone, but only if he knows how much higher he needs to go. Largent did not have this information. Also, Largent did not ask for temperatures aloft when Shields was reporting the winds aloft. Coogan stated that this information is helpful because the colder it is, the less the chance of icing. By not requesting certain pertinent information that a pilot of his experience should have recognized as necessary, Coogan testified, Largent did not leave himself an out should he have encountered icing. James Strang, Largent's flight instructor, corroborated this opinion. He stated that Largent had the ability and experience to recognize that he would be likely to encounter icing on this flight. Strang drove past the airport later that morning on his way to the crash site

and stated that he would not have flown into that weather.

Even George Rhodes, plaintiffs' own expert pilot, testified that when flying in winter conditions, a prudent pilot would ask for a report on icing if none were given during the weather briefing. Rhodes stated that icing can occur at any time and when the conditions are right, a pilot should always leave himself an out. In doing so, Rhodes said, it would "be nice" to know the tops and the temperatures aloft, information which Largent did not request.

Another defense witness, Willis Bublitz, was a pilot for the forest service who encountered icing near Hot Springs later that morning. Bublitz said that he anticipated icing that day just by observing the weather conditions. He stated that before taking off in the winter, he always called the weather service and asked for ice reports and top reports. The defendant's expert Allen Pearson opined that the conditions necessary to produce moderate icing were not present. He based this conclusion largely upon radar reports from Rapid City and Alliance which in his opinion, showed only "rime" icing conditions existing in those areas. As the defendant indicated, however, the only means for *direct* observation of icing are pilot reports from aircraft in flight. Although there was conflicting testimony respecting the interpretation of the weather data for the Hot Springs area, the evidence is uncontroverted that two separate pilots flying in the forecast area reported icing on their aircraft. The defendant's evidence ignores that it would take only a small degree of airplane icing on the wings of Largent's plane to affect the lifting power of the aircraft. The evidence must also be evaluated along with the current NWS forecast concerning Largent's actual route that specifically warned of icing conditions which the government negligently failed to disclose to Largent, as well as the actual icing experience of the ground witnesses. Even the trial judge found that icing conditions existed at the time and site of the crash.[3]

---

**3.** The following colloquy between the trial court and the government's witness Miss Lee destroys

the dissent's view that icing was *not* in the area:

FAA regulations mandate that the pilot in command of an aircraft is directly responsible for, and is the final authority as to, the operation of that aircraft. 14 C.F.R. 91.3(a) (1986). Largent's Beech Baron was not equipped with deicing equipment other than a pilot heater, which keeps the airspeed indicator functioning, and a propeller anti-ice fluid system. Thus, he had no apparatus, such as inflatable boots, to remove ice from the wings. He should have been especially alert to the possibility of icing and should have been prepared to deal with it. The evidence supports the trial court's finding that Shields was negligent, and although arguably Shields' description of "good" weather could have lulled Largent into such belief, we agree with the district court that Largent was guilty of some negligence. He was in the immediate area and could observe the local ground conditions. Notwithstanding the government's negligence, Largent failed to ask either Shields or Kasen for relevant weather information crucial to the safe conduct of this flight. We find substantial evidence exists that supports the trial court's finding that Largent was guilty of some negligence and under the circumstances we cannot say that finding is clearly erroneous.

South Dakota Codified Laws Annotated § 20-9-2 (1979) provides:

In all actions brought to recover damages for injuries to a person or to his property caused by the negligence of another, the fact that the plaintiff may have been guilty of contributory negligence shall not bar a recovery when the contributory negligence of the plaintiff was slight in comparison with the negligence of the defendant, but in such case, the damages shall be reduced in proportion to the amount of plaintiff's contributory negligence.

The district court found that Largent's negligence was more than slight in comparison with the negligence of the government. "Slight" negligence as used in the statute means "small in quantum in comparison with the negligence of the defendant," rather than the common standard of the reasonably prudent person. *Crabb v. Wade,* 84 S.D. 93, 97-98, 167 N.W.2d 546, 549 (1969); *see also Lovell v. Oahe Elec. Coop.,* 382 N.W.2d 396, 399 (S.D.1986). What constitutes slight or small varies with the facts and circumstances of each case. *Urban v. Wait's Supermarket, Inc.,* 294 N.W.2d 793, 796 (S.D.1980); *Crabb,* 84 S.D. at 98, 167 N.W.2d at 549. We have previously held in applying South Dakota law:

[T]hree factors may properly be considered in appraising the quality of a plaintiff's negligence: the precautions he took for his own safety; the extent to which he should have comprehended the risk as a result of warnings, experience, or other factors; and the foreseeability of injury as a consequence of his conduct.

BY THE COURT:

Q. The word "icing" was used in the area forecast. The subsequent forecast also used the word "icing". What is so difficult about using the word "icing" when that really as it turned out there was icing?

Whether or not that was the causal connection, that's a decision that has to be made, but there was icing. There was a report of icing. There was a subsequent report of icing and there was icing. Why is it it was so difficult for Mr. Shields to use the word "icing" I wonder?

This has been on my mind for a week and a half. What caused him not to give or to say the word "icing" instead of scrambling all around it?

A. We are not required to give a forecast of any kind verbatim. We don't have to give them verbatim. When he is talking to an instrument rated pilot, that instrument rated pilot should realize when he has clouds, low ceilings, temperature below freezing, freezing precipitation, that there is a chance of icing.

Q. Why even put the word "icing" in the report if it didn't have some significance?

Why would you feel justified to leave the word "icing" out, where it is used in two reports and in fact icing did occur? Wouldn't you using normal good judgment have put in the word "icing"?

Say, "Look. They reported some icing. We don't know how good this is. We have conflicting reports, but there is a report of icing."

I know what you are saying, you aren't required by law maybe to use the exact words. That's your position at least, but when they go to all the trouble to tell you there is icing, why won't you use it? I am struggling with it.

Transcript at 1247-49.

*Associated Engineers, Inc. v. Job,* 370 F.2d 633, 641 (8th Cir.1966); *see also Lovell,* 382 N.W.2d at 399. Taking these factors into consideration, we believe that substantial evidence exists such that the district court could find Largent's negligence to be more than slight in comparison with the negligence of Shields.

■■■ However, the difficulty with the trial court's finding is that it must compare Largent's negligence with the total negligence of the government.[4] We have held that the court erred in its analysis that Kasen was not negligent. Under the circumstances, the trial court must compare Largent's conduct with the overall conduct of *both* Shields and Kasen. We think the record is clear that Kasen owed a duty to provide Largent with the most recent weather forecast. Thus, although some evidence exists to support the finding that Largent may have been negligent, whether such negligence was more than slight when compared with the *overall* negligent conduct of the government is a question that should be passed upon by the trial court.

■ Kasen and Shields were acting in concert on behalf of the government. Shields had earlier told Largent that between Rapid City and Salt Lake the weather was "all good." Largent did not know that Shields intended to tell Largent of any update on the forecast two hours later. The government cannot rely on the independent fact of Shields' "state of mind"— that is, the intent to update the forecast— and Kasen's alleged ignorance of Shields' intent. As far as evaluating the government's conduct, the conduct of Shields and Kasen must be looked upon as one continuous act by a single entity. In other words, the government agents had a duty to tell Largent, when he called back, the current forecast or if none was available to tell Largent that the earlier forecast was incomplete and must be amended to include

icing conditions. If Shields withheld weather data (icing conditions) from the first report and intended to update Largent at the time that Largent was scheduled to call back, Kasen was duty bound as Shields' co-employee to tell Largent the correct information.

Under the circumstances, we must remand to the trial court to reevaluate the evidence concerning Largent's negligence in terms of the comparison of *both* Shields' and Kasen's conduct. In doing so we emphasize that Shields' conduct, although negligent, was somewhat justified by his assumption that he could amend any changes in the forecast when Largent called in at 6:00 a.m. To urge that Kasen was not negligent because he relied on Shields' incomplete briefing placed Largent in a "Catch–22" situation.

As we will discuss, we find the trial court erred as a matter of law in holding that Altringer was barred by reason of the existence of a joint enterprise. However, before discussing this issue, it is necessary to pass on the trial court's finding that the negligence of the government was not a proximate cause of the crash.

**Causation**

■■ Plaintiffs assert that this crash was caused by structural icing on Largent's airplane. The government claims the evidence shows that Largent became spatially disoriented and lost control of the airplane when he flew into the overcast because he was not qualified to fly into IFR conditions. The district court held that the plaintiffs failed to prove that icing was the proximate cause of the crash. It further observed: "This Court declines to speculate as to the specific cause of the crash. However, the Defendant's theory that Mr. Largent lost control of the aircraft due to spatial orientation is a more plausible explanation especially in light of the fact that mechanical failure and icing have been ruled out."

---

4. This would be true even if Largent was negligent per se because he allegedly lacked sufficient hours to be currently IFR qualified. But such negligence would not be a contributing cause of the accident if it was caused by airframe icing. See note 7 infra. As such, there is no need to compare the negligence per se of

Largent with the negligence of the defendants. *Provancial v. United States,* 463 F.2d 760, 763 (8th Cir.1972); *see also Nugent v. Quam,* 82 S.D. 583, 152 N.W.2d 371, 377 (S.D.1967) (unless the want of ordinary care by both the plaintiff and defendant is a contributing cause of the injury, there is no purpose of making a comparison).

We may reverse the trial court's finding *when although there is evidence to support it,* we are left with the definite and firm conviction that a mistake has been made. *Anderson v. Bessemer City,* 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985) (citing *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 541, 92 L.Ed. 746 (1948)); *see also Taylor v. Pre-Fab Transit Co.,* 616 F.2d 374, 375 (8th Cir.1980). Having reviewed all of the evidence presented, we possess a firm and definite conviction that the trial court's findings on proximate cause are both devoid of evidentiary support and mistaken.

## Spatial Disorientation

Contrary to the district court's speculation, overwhelming evidence showed that Largent did not become spatially disoriented. According to the evidence presented, a pilot may experience spatial disorientation when he flies into a cloud bank and can no longer see the horizon. The evidence shows that in the clouds, he loses all visual references and may rely completely upon the balance perceptions registered in the semi-circular canals of his inner ear. Bernard Coogan testified that the semi-circular canals react to a change in the attitude of one's head, but the inner ear does not perceive very slight and gradual changes in attitude. Gravity, the thrust of the airplane, centrifugal force, turbulance, or the pilot's head movements, Coogan testified, can aggravate these false perceptions to such an extent that the pilot literally loses sense of where the ground is. Thus, before a pilot is permitted to fly solo into IFR conditions, he must become proficient in flying solely on instruments. Coogan stated that by learning to ignore his false balance perceptions and trusting the instrument readings, a pilot can fly in IFR conditions without incident.

The Beech Baron Pilot's Operating Manual explains:

The result of vertigo [spatial disorientation] is loss of control of the airplane. If the loss of control is sustained it will result in an excessive speed accident. Excessive speed accidents occur in one of two manners, either as an inflight airframe separation or as a high speed ground impact; and they are fatal accidents in either case. All airplanes are subject to this form of accident.

The record reveals that inflight airframe separation occurs when a pilot experiencing spatial disorientation recognizes that his perceptions are false and upon reading the flight instruments, overcorrects. This causes the various turn, pitch, and altitude controls to exert so much pressure on the airframe that the airplane literally breaks apart in mid-flight. There is no evidence or any allegations that Baron 8592R underwent this type of stress. The alternative was that an excessive speed ground impact occurred. "Excessive speed" is defined in the Beech Baron manual as an airspeed "greatly in excess of two operating limitations which are specified in the manuals: Maximum manuevering speed and the 'red line' or 'never exceed' speed." The manual states that the red line or never exceed speed for the Beechcraft Baron B55 is 233 knots or 257 miles per hour. The maximum maneuvering speed is 156 knots or 180 miles per hour.

The evidence in the present case shows that the airplane did not crash at an excessive speed as defined in the manual. Plaintiffs' expert, George Rhodes, opined that the plane impacted the ground at a speed between 90 and 110 miles per hour in a slightly nose down attitude. He also stated that it crashed onto hard, frozen, clear ground on a ten degree downslope, but the record shows that the plane came to rest only twenty-two feet past its point of impact. The only inference available is that the plane crashed at a relatively slow speed. Defendant's own expert accident reconstructionist testified that the airplane could not have been traveling at more than sixty miles per hour upon impact.

Additionally, if one were to accept spatial disorientation as the cause of this crash, one would have expected the plane to show signs of having been out of control at impact. There was no such evidence here. The evidence showed that when the plane crashed, the wings were in approximately a

thirty-degree left bank attitude, which was essentially level with the ground at the point of impact. The evidence also showed that the plane clipped a small pine tree at a point fifteen feet above ground, approximately 100 yards from the point of impact. In other words, it flew a fair distance past this tree. Rhodes testified that this was "a rather good crash landing." He stated that the plane was not out of control and that the pilot did "a commendable job in doing what he should have done." Defendant's expert, William Allen, did testify that this was an uncontrolled crash, but in an earlier deposition, he testified that Largent was trying to make a crash landing.

Allen also testified that when Largent flew into the clouds, he turned in the wrong direction, which the government asserts supports its spatial disorientation theory. The evidence showed that the plane took off in a northerly direction and then turned to the left, heading west. Allen stated he would not have anticipated that Largent would turn left to fly into the Black Hills at such a low altitude in IFR conditions. He also noted that Largent's heading selector was set to 165 degrees and that Largent had the 270 degree course to Casper tuned in on his radio, which indicated to Allen that Largent would have made a right turn after takeoff to 165 degrees and climbed on that course until he was safely above the terrain to the west or until he intercepted the Casper VOR.[5] However, Allen's testimony does not take into account that Largent filed his flight plan out of Rapid City. An examination of the maps in evidence shows that had Largent intended to fly south until he intercepted the 270 degree VOR heading out of Cheyenne, he would essentially be flying to Chadron before heading west. Chadron also has an FSS, and had this been Largent's intended route of flight, it is equally plausible that he would have called Chadron to obtain his weather briefing and file his flight plan.

The evidence shows that Largent did in fact intend to make a left turn and fly in a northwesterly direction. Several factors in the record reinforce this conclusion. First, Largent was cleared by Denver Air Traffic Control (ATC) to fly at an altitude of 10,000 feet. Exhibit twenty-three, which is the Cheyenne sectional aeronautical chart in effect at the time of the crash, shows that although Casper is almost due west of Hot Springs, a pilot without a special clearance flying at an altitude of less than 12,000 feet must fly around the Edgemont Military Operations Area which lies between Hot Springs and Casper. To do this, one must fly either straight south toward Chadron and then west to Casper or northwest toward Newcastle and then west. Our calculations show that the Chadron route is approximately 172 miles while the Newcastle route is only 156 miles.

Second, an examination of the sectional map shows that flying northwest, the pilot would encounter Low Altitude Federal Airway V26 that connects Rapid City and Casper. Airway V26 is a controlled airway. The Airman's Information Manual received in evidence indicates that certain requirements exist for operating in a controlled airway, including flight only at the altitude assigned by the ATC. Kasen had informed Largent before takeoff that Denver ATC had assigned him an altitude of 10,000 feet. This assignment suggests that Largent intended to fly in a controlled airway, and the southerly route suggested by Allen does not intercept such an airway.

Finally, Judy Kaufman, a friend of Largent's, testified that Largent had told her he flies over her house when he flies west. Our study of the maps shows that Kaufman's house is located approximately seven miles northwest of the Hot Springs Airport on a course one would expect a pilot flying from Hot Springs to get onto V26. Thus, the evidence shows that in all probability, Largent intended to turn left shortly after takeoff.

5. Allen testified that a VOR is a radio navigation center that broadcasts radio signals in all directions. If a pilot wishes to plot a course toward that station, he tunes into the proper frequency and the plane's instruments will guide the pilot to the proper heading. Once on course, the instruments will indicate whether he is drifting off course.

Largent departed from the Hot Springs Airport at 6:27 a.m. Kaufman testified that at 6:30 or 6:35, she heard an aircraft fly over her house from the north towards the southeast at what she described as a "very low" altitude. According to the National Transportation Safety Board, Largent's plane crashed at approximately 6:38, three miles from and facing in the direction of the airport. The crash site is directly between Kaufman's house and the airport. The flight path suggested by this evidence is indicative of a pilot who is in trouble and is trying to return to his departure point. A disoriented pilot in all likelihood would not have taken such a logical route. All of this evidence in addition to that showing that the plane crashed at a speed just above the stalling speed,[6] in essentially a wings-level position and slightly nose down, demonstrates that the pilot flying this aircraft exercised a fair amount of control over its flight. On the basis of these evidentiary facts, we conclude, as did the trial court, that the record does not support a finding that the crash was caused by spacial disorientation.[7]

**Icing**

As the trial court recognized, the burden was on the plaintiffs to prove that the negligence of the government in failing to warn of icing conditions was a proximate cause of the crash. The evidence shows that structural icing is a potentially dangerous condition that can occur anytime there is visible moisture in the air and the temperature is below the freezing point. As Rhodes explained, icing not only adds weight to the aircraft, more significantly, it alters the aerodynamic performance of the affected surfaces on the aircraft thus reducing airspeed and hindering the lift capacity of the wings. Rhodes stated that icing can progress to the point where the airplane is no longer capable of flying. The Airman's Information Manual states

that as little as one-half inch of ice can reduce the lift capacity of some aircraft by as much as fifty percent and increase frictional drag by an equal amount. Icing increases an aircraft's stalling speed and decreases its cruising speed. Rhodes testified that even a thin coat of frost has been known to prevent some planes from being able to take off. Rhodes also said that ice can form on a windshield and impair the pilot's vision, which can be very troublesome psychologically to the pilot.

The conditions near Hot Springs at 6:30 a.m. on February 13, 1980, were certainly ripe for icing. The parties stipulated that the Kansas City area forecast known to Shields and in effect until 6:00 a.m. on February 13, 1980, contained a flight precaution for South Dakota and Wyoming for icing, ceilings below 1,000 feet, and visibilities of less than three miles. The National Weather Service forecast called for light to moderate mixed icing in clouds and precipitation freezing at the surface. The area forecast effective at 6:00 a.m. on February 13 contained a flight precaution for brief moderate, mixed icing until 9:00 a.m. over southwestern South Dakota. The record also reflects that weather conditions generally deteriorated throughout the early morning hours.

There was also testimony by several witnesses of icing on the ground. Gerald Bruce testified that he left for work from his home, located about four miles northwest of the crash site, shortly after 6:00 a.m. on that morning. He had to scrape approximately one-eighth inch of ice off of his windshield before he left for work. As he drove toward Hot Springs, he had to drive downhill about two and one-half miles, then back uphill again. As he ascended, at approximately 6:20, he entered the clouds or a fog bank at 3900 feet MSL. Over the course of the one mile that he drove through this cloud bank, he had to

---

6. The evidence showed that the plane weighed about 5100 pounds at the time of the crash and the flaps were slightly up upon impact. Under these conditions, the Beechcraft Pilots Operating Handbook lists the stalling speed at 90 miles per hour.

7. One point of dispute at trial, on which a considerable amount of evidence was taken, was whether Largent was IFR qualified. Because it is evident from the physical evidence that spatial disorientation did not cause this crash, it is unnecessary to discuss Largent's IFR qualifications further.

stop three times to scrape the ice off of his windshield even though his car had warmed up and his defroster was on. Each time the windshield iced over, he stated, the accumulation of ice was sudden.

Judy Kaufman, who also lives in the vicinity of the crash site, testified that when she heard Largent's airplane fly over her house that morning, she stepped outside and noticed ice crystals on her deck. At 7:45, she noticed an eighth to a quarter-inch of ice on her windshield as she got ready to go to work.

Jim Geddis was driving his truck south on Highway 79, just north of the Hot Springs Airport, when he encountered a fog bank. He stated that at that time, he experienced a sudden coating of clear ice an eighth to a quarter-inch thick over the entire truck. As he was standing outside looking at the truck, he heard a boom that he later came to believe was the sound of the plane crashing.

Joe Gamet also heard Largent's plane fly over his home that morning. He stated that he heard the plane's engines rev and he immediately sensed that something was wrong. He concluded that the plane was too low and the engines were rough. Fifteen seconds later his wife told him that she heard the plane crash. Gamet telephoned the sheriff to notify him that a plane had gone down nearby and set out to find the wreckage. Gamet drove part of the way, then hiked over a ridge. As he hiked up the ridge, he noticed that the temperature got warmer. When he got to the top of the ridge, he surmised that the pilot of the aircraft was probably trying to fly over the ridge to get on the down slope on the opposite side where, heading into the fifteen to twenty mile per hour wind present that morning, he could pick up some airspeed and put the airplane down on the more level ground to the east. Gamet testified that there would have been no possible hope of ditching or belly landing the plane in the valley where his house was located without bad results.

Gamet found the plane and said he could find no signs of life among any of the passengers. At the crash site, he found precipitation in the form of water droplets. It was not frozen. He estimated the cloud ceiling at the crash site to be 150 to 200 feet. Gamet spent about ten minutes at the crash site and briefly inspected the plane. He stated that he ran his fingers over the leading curve of the left wing and felt moisture, but no ice. He saw no ice around the aircraft.

Forty-five minutes later, Gamet returned to the crash site with Sheriff Leo Bray. Bray stated he found twenty to forty thousandths of an inch of ice on the leading edges of the wings of the plane, but he saw no ice on the ground. Sometime later, Largent's instructor, Jim Strang, arrived from Chadron. Strang pointed out to Bray dust trails on the air intake of an engine on the plane, which indicated where ice had been. Bray and Strang apparently did not search the entire plane; Strang merely pointed this out to Bray as an observation. Strang was not an investigator; he was merely at the site to look the wreckage over since he had recently done mechanical work on the aircraft. Bray stated that he did not do an extensive examination for evidence of icing.

National Transportation Safety Board investigator Richard Brandiger examined the wreckage at about 10:00 a.m. that day. He found an eighth of an inch of ice on the leading edge of both wings and the horizontal stabilizers. He testified that the ice ran back three inches from the leading edge. He found no ice anywhere else on the plane nor any ice on the ground nearby. Other investigators later found pine cones, needles, and bark inside the wreckage and wondered if the plane had hit a tree before crashing. A subsequent search of the crash area revealed damage to a small pine tree at the top of the ridge that Largent had crashed on and a broken piece of plexiglass that apparently resembled a landing light cover. Investigators concluded that the plane brushed the tree with its left wing about fifteen feet above ground and crashed approximately 100 yards further down the hill.

The trial court based its conclusion that ice did not cause this crash on the fact that Gamet found no ice on the aircraft or near

the plane when he found the wreckage. The evidence shows, however, that Gamet made only a cursory inspection of the wreckage and did not search the point of impact nor the area of the pine tree struck by the plane. This is understandable since determining the cause of the wreck was likely not Gamet's primary thought at the time. Given the force of the impact that occurred (the evidence showed that the plane was traveling approximately 100 miles per hour but skidded or bounced only twenty-two feet beyond impact; pictures revealed that virtually everything in the cockpit was forced out the front of the aircraft), it is not only conceivable but likely that had structural icing occurred, most of the ice would have been jarred loose from the airplane and smashed upon contact with the ground. It is also likely that the pieces of ice left over melted immediately or at least shortly after impact. Gamet testified to a temperature inversion as he climbed the ridge and stated that he found liquid, not frozen, precipitation at the crash site. Sheriff Bray did not begin to examine the crash site until nearly two hours after the actual crash which would be enough time for the temperature inversion to lift or dissipate and would explain the ice Bray found on the wings.

Although the evidence showed that the Beech Baron should have been capable of flight with an eighth to a quarter inch of ice on the wings, it is clear from Rhode's testimony that even that amount could significantly alter the performance of the plane.[8] Given the suddenness with which the icing occurred that day (both Geddis and Bruce stated that icing of their vehicles was virtually instantaneous), the fact that the airplane was fully loaded if not

slightly over its weight limitations,[9] and the fact that Largent most probably was not expecting icing difficulties, the only plausible conclusion to be reached is that icing brought this aircraft down.

The government attempts to refute this reasoning in several ways. First, it offers the testimony of Bublitz, the pilot for the United States Forestry Service who encountered light icing later that morning in a similar airplane. It argues that Bublitz, who also had three full-grown male passengers aboard, picked up an eighth to a quarter inch of airplane icing and had no difficulty continuing his ascent. The government overlooks several other factors. First, Bublitz' plane differed from Largent's in two important respects: it had more horsepower and it was equipped with inflatable deicing boots that would prevent buildups of substantial amounts of ice on the plane wings. Thus, when he encountered the icing, Bublitz knew that if the plane experienced too great of a build-up, he could activate the boots and rectify the problem. Largent, on the other hand, had no icing equipment. His only prudent alternative upon encountering the icing would be to try to drop down under the clouds and turn around and head back to the Hot Springs airport. This is exactly what the evidence shows he attempted to do.

Second, the government argues that the evidence is insufficient to prove that Largent encountered an ice storm. It notes that the roads on which Kaufman, Geddis, and Bruce drove were not icy. It points out that Kaufman testified she did not experience icing once she started driving and the radar data from that area did not indi-

---

8. The dissent relies on the Beech Baron pilots manual that the plane could fly with at least one-half to one inch of ice. This ignores the undisputed evidence that even one-eighth of an inch on the wings can affect the power lift of the plane and cause a crash. Even the government's expert said he would be concerned over an accumulation of one-fourth of an inch. It was undisputed that any amount of ice affects the handling characteristics of a plane.

9. A considerable amount of evidence was introduced concerning whether the airplane was ov-

erweight at takeoff. The district court found that the plane was 126 pounds overweight at takeoff, which can affect the handling characteristics of the aircraft. The court further found, however, that the reason Largent overloaded the plane was because he relied on the erroneous calculations of a mechanic who had done a weight and balance test on the airplane the previous year. The court accordingly held that Largent was not at fault for the overweight condition of the plane. This finding is not disputed.

cate substantial amounts of moisture in the air. Furthermore, the government argues, Gamet found no ice on his truck that morning and Geddis could not identify where he encountered the icing on his truck. This argument too, however, overlooks other significant evidence. All of the ground witnesses who experienced icing were at or above the 3900 foot MSL level at the time they experienced the icing. Bruce experienced icing as he ascended a ridge at the 3900 foot mark. The elevation of Bruce's house where he first found his car covered with ice was 4140 feet MSL. Kaufman lived at 3968 feet, where she too found her car covered with ice. Gamet, however, who found no ice on his truck that morning, lived only at the 3223 foot level.

The elevation at the Hot Springs airport is 3143 feet. With a 700 foot ceiling, it is reasonable to infer that Largent encountered icing shortly after entering the clouds, at approximately 3900 feet. In addition, the evidence showed that the potential for hazardous icing is greater on the windward side of a mountain range. With a twenty mile per hour northeasterly wind, and conditions admittedly ripe for light icing at·the very least, it is clear that Largent was flying directly into potentially hazardous icing conditions as he climbed to 3900 feet and turned directly into the windward side of the Black Hills. It was somewhere near here, on Highway 79, that Ged-

dis experienced the instantaneous accumulation of a quarter inch of ice on his truck.

Third, the government contends that had Largent been surprised by instantaneous icing, he would have immediately notified Denver ATC by radio. However, plaintiffs' expert, Rhodes, who has gone down twice in airplanes, testified that the pilot's first priority in an emergency situation is to fly the aircraft. If he is encountering trouble, he is probably going to be terrified, as are his passengers. Not only did Largent have to try to land safely, Rhodes surmised, he may have had to deal with three panicking passengers. In addition, Rhodes testified that often the first part of an airplane to ice over is the radio antenna. This, he stated, breaks radio communications.

The parties presented the court with only two possible alternatives: structural icing or spatial disorientation by the pilot. Based upon the evidence presented, we conclude the only permissible inference that can be drawn from all of the evidence is that airplane icing was a substantial factor in the crash. In this regard, spatial disorientation as a causal factor is only speculative. We possess a firm and definite conviction that the overwhelming evidence demonstrates that.

We thus conclude it was clearly erroneous for the trial court to find that the government's negligence was not a substantial factor in the cause of the airplane crash.[10]

---

10. We will not repeat our assessment of the record on matters raised by the dissent except in areas where the dissent raises segments of the record not previously discussed. We write here to briefly respond to the dissent's charge that the majority has failed to show proper deference to a district judge's finding of fact and that in doing so we have ignored the principles behind the clearly erroneous rule. Simply because a court possesses a firm and definite conviction that a mistake has been made in the trial court's findings does not mean that those judges who determine the record (10 vols. of transcript) does not support the trial court's findings have totally usurped the trial courts' prerogative. Such a charge is certainly not justified on this record. Ironically, it is the dissent's analysis on this record which misconstrues the principles governing the clearly erroneous rule.

Our firm and definite conviction that a mistake has been made arises solely from our assessment of the overwhelming evidence. This is succinctly illustrated by the record. For example, the dissent points up the trial court's finding that Kasen reasonably believed Largent was seeking only clearance for his flight when Largent asked him "what do you have up there." Yet the record shows Kasen responded in detail about weather information but did not reveal the icing forecast. To fail to set aside the trial court's finding that Kasen considered this only as a request for clearance is to ignore the record and would otherwise require us to abdicate our appellate role.

The dissent states that the majority has violated the rule in *Anderson*, that "where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." 470 U.S. at 574, 105 S.Ct. at 1512. The dissent acknowledges that the trial court refused to speculate as to the cause of the crash. Our conclusion that plaintiffs' evidence clearly demonstrates that icing was a substantial factor in the crash is the *only* conclusion that has been

## Joint Enterprise

■ The government does not claim that the passenger, Altringer, was guilty of any active negligence. The government urges that Altringer is barred from recovery by reason of the imputed negligence of Largent, the pilot, under the doctrine of joint enterprise. The trial court so held.

Although this court normally gives deference to the trial judge's determination of state law, we cannot do so here. The court's analysis relies on the few cases in South Dakota involving imputed negligence under a joint enterprise theory in the driving of an automobile. The trial court found as follows:

Even if icing was the proximate cause of the accident, Mr. Altringer would be barred from recovery because Mr. Largent and Mr. Altringer were involved in a joint venture. The essential elements for a joint venture are: (1) an agreement, express or implied, among the members of the group; (2) a common purpose to be carried out by the group; (3) a community of pecuniary interest in that purpose among the members; and (4) an equal right to a voice in the direction and control of the enterprise, which gives an equal right of control. *Fredrickson v. Kluever* [82 S.D. 579], 152 N.W.2d 346, 348 (S.D.1967).

There was an agreement that the four persons would travel together in Mr. Largent's plane to inspect the cattle. As both Mr. Largent and Mr. Altringer were shareholders in Fall River Feedlots, they had a pecuniary interest in the cattle that they had purchased. Mr. Largent, as manager, and Mr. Altringer, as assistant manager, both had an equal right to a voice in the direction and control of the cattle inspection. Therefore, a joint venture existed. *See Scheuring v. Northern States Power Company* [67 S.D. 484], 294 N.W. 175 (SD 1940) (Being parties to the same enterprise, they are *assumed* to have common control and possession of the machine). Equal right of control is not equivalent to equal ability to control. Therefore, the fact that Mr. Altringer was unable to pilot the aircraft is immaterial.

The South Dakota cases do not provide more than a general abstraction of the joint enterprise doctrine.

Whether this analysis should apply to the flight of an airplane, where there was no question as to who was the pilot in command, and where the passenger was not trained to fly and could not operate the airplane, is somewhat questionable. Another uncertainty exists, as well, when, assuming a joint enterprise existed in the airplane flight, the negligence of Largent (failure to obtain full weather briefing) occurred before the putative joint enterprise trip commenced. Thus, we deem it questionable whether the pre-flight negligence could be imputed to Altringer, even assuming the joint enterprise existed once the flight commenced.

proven with any degree of reasonable certainty on this the overall record. The trial court properly refused to speculate on other possible reasons the crash occurred. The trial court did not choose *one* permissible inference and we chose the other. The fact remains based upon the overall circumstances there was no *permissible* inference of proximate cause other than airframe icing proven on the record. It is not the duty of a plaintiff in a civil case to exclude every other reasonable hypothesis of the crash. The fact that the defense may *suggest* other possible reasons for the crash does not create an impossible burden of proof for the plaintiffs. It is purely speculative on this record to say that spacial disorientation was the causal factor in the crash. The trial court acknowledged this. Perhaps the pilot had a heart attack or the engine failed for unknown reasons; these reasons are just as plausible as spatial disori-entation. The same cannot be said about the detailed evidence produced to show that icing was *a* substantial factor in causing the crash. Plaintiffs clearly produced sufficient evidence to carry their burden of proof that the government's gross negligence was a proximate cause of the crash. If the trial court held that plaintiffs did not prove a prima facie case of icing it would be wrong as a matter of law and the case would have to be remanded. But we read the record differently. We assume that the trial court would recognize that plaintiff has carried his burden of proof of a prima facie case. The trial court simply found that icing was not a proximate cause of the accident. Our analysis demonstrates that this finding ignores the overwhelming evidence to the contrary. On this basis, it is the majority's firm and definite conviction that the trial court was mistaken.

However, notwithstanding these uncertainties, we find the legal analysis made by the trial court overlooks the overwhelming case law governing joint enterprise. There is no indication that South Dakota law is not in accord with the controlling legal analysis of other jurisdictions dealing with the law of imputed negligence and joint enterprise. In passing upon this issue, we are mindful that the courts do not favor the doctrine of joint enterprise and that parties alleging the existence of a joint enterprise for the purpose of imputing negligence have a heavy burden of proof. *See Lester v. John R. Jurgensen Co.*, 400 F.2d 393, 396 (6th Cir.1968); *Melville v. Maryland*, 155 F.2d 440, 443 (4th Cir.1946); W. Prosser & P. Keeton, The Law of Torts § 72, at 522 (5th ed. 1985). As explained by Professor Prosser, the doctrine of vicarious liability arising from a joint enterprise rests upon an analogy with the law of partnership in which a mutual agency exists for purposes of conducting business, so that the acts of one are to be charged against another. *Prosser*, at 516. Similarly, a joint enterprise is akin to a partnership, but for a shorter period of time and a more limited purpose. *Id.* at 517. The law considers that each person associated in the enterprise "is the agent or servant of the others, and that the act of any one within the scope of the enterprise is to be charged vicariously against the rest." *Id.; see also* Restatement (Second) of Torts § 491 (1979).

The district court found a joint enterprise between Largent and Altringer arising from their agreement to fly to California to inspect cattle purchased for their business. There can be no doubt that the purpose of this flight was directly related to their duties with Fall River Feedlots, Inc. It is their relationship to the corporation, however, that illustrates the inapplicability of the joint enterprise analysis to this case. Largent and Altringer's relationship was not one of partners; they were employees and shareholders of a corporation. While the negligence of a corporation's employees may be imputed to the corporation, it is equally clear that the negligence of an employee will not be imputed to a co-employee in the absence of tortious conduct of his own. *See, e.g., Kocher v. Creston Transfer Co.*, 166 F.2d 680, 685 (3d Cir.1948) (existence of co-employee status does not, in and of itself, justify the appellation "joint enterprise"); *Melville*, 155 F.2d at 443 (relationship of fellow servants alone not sufficient for the imputation of negligence); *Laird v. State Farm Ins. Co.*, 290 So.2d 343, 348 (La.App.), *writ den.*, 293 So.2d 1984 (La.1974) (the fact that fellow employees are acting in the course and scope of their employment and in furtherance of their employer's business does not in itself make them participants in a joint venture); *Nadeau v. Melin*, 260 Minn. 369, 382, 110 N.W.2d 29, 38 (1961) (even where passenger has right to control the manner of operation of a vehicle in which he is riding, the negligence of the driver, a fellow employee, will not be imputed to the passenger in the absence of a relationship which would establish vicarious liability); *Connell v. Hayden*, 83 A.D.2d 30, 443 N.Y. S.2d 383, 397 (1981) (a servant is not vicariously liable for the negligence of his co-employees; each is liable for his own negligence only); *Bartholomew v. Oregonian Publishing Co.*, 188 Or. 407, 216 P.2d 257, 260 (1950) (mere co-employment is insufficient basis upon which to rest the imputation of a driver's negligence to a passenger); *Ratcliff v. Myers*, 382 Pa. 196, 113 A.2d 558, 561 (1955) (it is well established that imputed negligence does not apply to co-employees engaged in a business mission for their employer); Restatement (Second) of Agency § 358(1) (1958) (agent not liable for conduct of other agents unless he is at fault for appointing, supervising, or cooperating with them); Restatement (Second) of Torts § 491, comment d (1979) (co-employees, by virtue of that relationship alone, do not engage in joint enterprise). Similarly, an officer of a corporation will not be responsible for the tortious conduct of another officer or agent of the corporation without some participation, authorization, or direction of his own in the tortious conduct.[11]

11. *See Leonard v. St. Joseph Lead Co.*, 75 F.2d 390, 395 (8th Cir.1935) (officer or director of

The designated record before us reveals very little about the corporate structure of Fall River Feedlots. All we can glean from the record is that Largent was an incorporator of the company and, at the time of his death, was a shareholder and held the offices of president and manager. Altringer was a shareholder and assistant manager. As the district court found, this flight had the primary if not sole purpose of inspecting cattle purchased by Fall River Feedlots. In the absence of any other purpose for the flight that would meet the requirements of a joint enterprise under South Dakota law, we must find that Largent and Altringer were agents of Fall River Feedlots, not of each other. South Dakota law permits businesses to incorporate, and persons incorporating their business must be permitted to take advantage of that form of business. One advantage is limited liability of the corporation's agents. In selecting the corporate form under which to operate the business, Largent and Altringer thus avoided the joint and several liability rules prevalent under South Dakota partnership laws. To now impose a joint enterprise relationship on Largent and Altringer would circumvent South Dakota protections pertaining to corporations. Under the above-cited principles, a finding that a joint enterprise exists would be impermissible.

Even if the corporate structure could be ignored, it is evident that as president and manager of the feedlot, Largent was Altringer's superior. Thus, if any principal-agent or master-servant relationship existed, it would be with Largent as principal and Altringer as agent. Since, however, Largent was piloting the aircraft, it can in no sense be stated that Altringer had any right of control over the operation or direction of the plane. Thus, the element of mutual right of control necessary to establish a joint enterprise was not present in this case. *See Robertson v. United Fuel & Supply Co.*, 218 Mich. 271, 187 N.W. 300, 301 (1922) (while the negligence of a servant driving will be imputable to a master, the negligence of a master driving is not imputable to a servant; the servant has no control over the master).

We vacate the judgment of the district court and hold that Altringer is not barred from recovery. We remand the case to the district court to determine damages and to enter judgment against the government for plaintiff Altringer. We remand to the trial court for reconsideration under the South Dakota comparative negligence statute as to whether Largent's negligence was more than slight in comparison to the overall negligence of both of the government employees, Shields and Kasen.

JOHN R. GIBSON, Circuit Judge, concurring and dissenting.

I respectfully dissent.

While I agree with the conclusions the court reaches today with respect to the joint venture issue and concur fully in that aspect of the opinion, I believe that the court has cast aside plausible findings of the district court based on substantial evidence, ignoring the limitations placed on our review by Fed.R.Civ.P. 52, as recently discussed in *Anderson v. City of Bessemer City*, 470 U.S. 564, 573–76, 105 S.Ct. 1504, 1511–13, 84 L.Ed.2d 518 (1985). The Supreme Court made clear in *Anderson* the importance of the role of the district court and its particular experience and expertise in fact-finding. It cautioned that an appellate court should not duplicate the district court's fact-finding function by making its own determination of the facts and reversing if it would have decided the case differently. This is precisely what the court has

corporation not personally liable for torts committed by the corporation where he has not participated therein, nor had any knowledge of, nor given any consent to the act or transaction); *Galvan v. McCollister*, 224 Kan. 415, 580 P.2d 1324, 1325 (1978) ("a director or officer of a corporation does not incur personal liability for its torts by reason of his official character"); *Morgan v. Eaton's Dude Ranch*, 307 Minn. 280, 283, 239 N.W.2d 761, 762 (1976) (officer is not liable for the torts of the corporation's employees unless he participated in, directed, or was negligent in failing to learn of and prevent the tort); *Connell*, 443 N.Y.S.2d at 402 (officer or agent of corporation is not liable for torts of other officers or agents merely because of his office); *see also* 1 Fletcher, Cyclopedia of Corporations § 33 (1983).

done today, ignoring *Anderson's* teaching that "[w]here there are two permissible views of the evidence, the fact-finder's choice between them cannot be clearly erroneous." *Anderson,* 470 U.S. at 574, 105 S.Ct. at 1512 (citing *Inwood Laboratories, Inc. v. Ives Laboratories Inc.,* 456 U.S. 844, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982)). The court today has simply taken the evidence most favorable to its conclusion, ignoring that to the contrary, and has substituted its findings for those of the district court.

The district court found that plaintiffs had failed to show by a preponderance of the evidence that icing was the proximate cause of the crash. It found that radar information indicated a lack of echoes in the area, which meant that only small water droplets were present. There was meteorological evidence that the clouds necessary to produce moderate or severe icing were not present. Evidence at the crash site indicated that Largent did not encounter the type of weather the several lay witnesses reported. The temperature at the crash site was at or below freezing, and there was no evidence of ice near the point of impact.[1] The Beech Baron flight manual indicates that an airplane could fly with at least one-half to one inch of ice, because the manual only recommended using deicing equipment once that amount of ice had accumulated. Only one-eighth of an inch was found on the Largent plane, which would be considered light icing and would not be significant enough to cause the crash. Another Beech Baron flying some thirty miles south of the crash site was able to climb above 8,000 feet with one-eighth to one-quarter inch of icing on its wings.[2] The court today ignores these findings in reaching its conclusion that icing was the cause of the accident.

The Largent plane was in the air between five and thirteen minutes. It took off at 6:25 and made radio contact with Denver at approximately 6:26. When the Gamets heard the crash, they called the sheriff's office. Their call was timed at 6:30. The clocks in the plane both stopped at 6:38. The district court found that the crash occurred between 6:30 and 6:38. The court today finds that the crash occurred at 6:38. According to either finding, there was a very short period of time during which sufficient ice could have formed on the plane to cause the crash.

A key finding of the court today, based on the testimony of plaintiffs' expert, is that the pieces of ice "melted immediately or at least shortly after impact." Joseph Gamet, who lived closer than any other witness to the crash site and heard both the plane and the crash, went to his pick-up truck to drive to the crash site. There was no ice on the truck. It did not slip or slide, nor did he when walking. While Gamet testified to a temperature inversion, and that there was moisture on his cap, he also testified (and the district court found) that he reached the crash site within twenty or thirty minutes and the temperature at the scene of the crash was close to freezing. To cast aside findings of the district court and conclude that sufficient ice to cause the crash—in all likelihood an inch or more—melted in twenty or thirty minutes in such conditions ignores not only the evidence in the record, but reality.

Gamet's testimony, together with that of other witnesses, supports the finding of the district court that weather conditions encountered by several of the lay witnesses were not encountered by the plane. James Geddis, the truck driver, said the fog bank that coated his truck with ice "was not very long at all," approximately two football fields in length. Gerald Bruce identified the mile-long icy area he encountered as about six miles west of the crash site and about six miles south and slightly west of Judy Kaufman's house. Kaufman described only snow grains or ice pellets beneath her feet when she heard the plane

---

1. Sheriff Bray could only speculate as to whether ice would have been knocked off the plane when it contacted the tree, since the plane brushed rather than directly hit the tree.

2. The pilot of the other Beech Baron testified the ice accumulated in four or five minutes. The plane he flew had more horse-power and gross weight, but no significant handling or performance difference as compared with the Largent plane.

flying overhead at 6:30, and she did not see the one-eighth to one-fourth inch ice coating on her car windshield until 7:45 a.m.

This testimony demonstrates differing weather conditions in the area. Allen Pearson, the government's weather expert, explained that the weather conditions Bruce and Kaufman encountered were caused by terrain or orographic effects. Pearson testified that the lift provided by air coming up the side of a hill creates clouds and brief weather changes. He stated that the plane would have not come close to the area where the weather conditions were as Bruce described them.

There was ample evidence in the record to support the district court's conclusion that the plaintiffs did not prove ice caused the crash.

The court today seems to reach its factual determination on the assumption that only two choices were presented for the cause of the crash, either icing or spatial disorientation. The district court declined to speculate as to the specific cause of the crash, but found that "spatial disorientation is a more plausible explanation." The court today sets up and demolishes a straw man based on an assumption of an excessive speed crash. However, the district court did not make a specific finding of spatial disorientation, but simply recognized it as a plausible explanation.

The government's expert witness, Allen, testified that the plane came to earth in an uncontrolled state consistent with a stall. There was testimony that the loading of the plane placed the center of gravity toward the rear, which would have altered the handling characteristics. The plane entered the clouds with the strobe lights on, which can accentuate the effects of spatial disorientation. The district court did not make further choice from among the various factors that might have contributed to the collision, but simply held that the plaintiffs had not borne their burden of proof by showing that icing was the cause of the crash. Suffice it to say that the court's assumption today that the only possible

causes of the crash were spatial disorientation or ice simply does not follow.

The court's finding that Kasen was negligent is based upon a further fact-finding expedition by the court. It converts the question "what have you got up there," and inquiries about Casper and Rock Springs into a general inquiry on weather conditions, imposing upon Kasen the additional duty to provide weather conditions relative to the flight and to go back to the earlier briefing given by Shields and to bring it up to date. Again, what the court does goes beyond determining that the district court was clearly erroneous in its findings, and substitutes this court's findings for those of the district court. Under *Anderson*, we may not do this.

The court discounts evidence that Largent was not IFR qualified, reasoning that such evidence had bearing only on the spatial disorientation theory, which the court rejects. The court completely overlooks the fact that Largent's failure to have IFR qualification itself constituted negligence on Largent's part, as it was in violation of 14 C.F.R. § 61.57(e) (1986) (amended 1986), and (as the district court found) negligence per se.

In reaching its conclusion today, this court ignores substantiated factual findings of the district court and substitutes its own. It violates the teaching of *Anderson v. Bessemer City* and the requirements of Rule 52. I would affirm the judgment of the district court with respect to Largent and remand only as to a consideration of Altringer's liability.