Joan BUDDEN and Wilma Lewis, Personal Representatives of the Estate of Craig Budden, deceased; Ronald Rodgers, d/b/a Rodgers Helicopter Service; Associate Aviation Underwriters, Appellants,

v.

UNITED STATES of America, Appellee.

No. 90–2354.

United States Court of Appeals, Eighth Circuit.

Submitted March 13, 1991.

Decided April 30, 1992.

* The Honorable G. Thomas Eisele, Senior United States District Judge for the Eastern District of Arkansas, sitting by designation.

C.L. Robinson, Omaha, Neb., argued, for appellants.

Thomas K. Pfister, Dept. of Justice, Washington, D.C., argued (Sally R. Johnson, Asst. U.S. Atty., Lincoln, Neb., Stuart M. Gerson, Asst. Atty. Gen., Washington, D.C., on brief), for appellee.

Before JOHN R. GIBSON, Circuit Judge, FLOYD R. GIBSON, Senior Circuit Judge, and WOLLMAN, Circuit Judge.

WOLLMAN, Circuit Judge.

This is an appeal from the district court's judgment in favor of the United States in this Federal Tort Claims Act action, 748 F.Supp. 1374. We vacate the judgment and remand for further proceedings.

In December of 1985, Rodgers Helicopter of Kearney, Nebraska, owned a Bell Long–Ranger helicopter N110LG, which it had contracted in the service of Good Samaritan Hospital of Kearney, doing business as a helicopter ambulance service under the name Air Care.

At approximately 5:45 p.m., December 20, 1985, Good Samaritan received a call from a doctor in Ainsworth, Nebraska, requesting that Air Care transport an eight-year-old boy, who was in critical condition with a skull fracture, from Ainsworth to a hospital in Omaha. The emergency room personnel at Good Samaritan immediately called Craig Budden, a pilot for Rodgers. At 5:52 p.m., Budden called the Omaha Flight Service Station and spoke with Robert Geranis, a flight service specialist with the Federal Aviation Administration. The transcript of their taped telephone conversation is as follows:[1]

OMA FSS   Omaha Flight Service

N110LG   Yes copter one one zero lima gulf can you tell me what you ah latest requested reported weather for Broken Bow and Ainsworth are

OMA FSS   I don't think ah they're reporting this late hold on (pause) uh they're still reporting ah the Broken Bow now this an hour old Broken Bow is an estimated one thousand five hundred broken six thousand overcast visibility was ten miles the winds two hundred at ten and the Ainsworth was an estimated five thousand broken visibility seven miles winds two ten at ten

N110LG   Okay and were they expect [sic] expecting any significant weather moving through that area in the next hour and a half

OMA FSS   You got a small area of marginal conditions ah right dead center the state its about probably sixty seventy miles wide and there's some scattered light snow shower activity in that area but about the worst I can find for forecast is occasional twelve hundred broken with a chance of three miles and light snow and fog ah

N110LG   Oh that's good news

OMA FSS   Until ten Z[2] then after ten Z they might have a chance of some I F R conditions out there in the central part

1. The government points out that there are slight differences in the transcript of the recorded conversation prepared by the National Transportation Safety Board and that prepared by the Federal Aviation Administration, which the district court adopted and which we have quoted here. We do not deem the differences to be material, and in any event we cannot say that the district court erred in adopting the FAA's version.

2. References to "Z" and "zulu" refer to Greenwich Mean Time, from which six hours are subtracted to give the corresponding central standard time.

N110LG  Okay but that's not significant you say that's ten zulu you said

OMA FSS  Yeah

N110LG  Okay so that's ah okay that's another ah

OMA FSS  Four A M

N110LG  Four A M yeah that's what I'm trying to figure out I didn't have a watch on me okay thank you

OMA FSS  Bye Bye

Budden, accompanied by two nurses, took off for Ainsworth at 6:01 p.m.  The helicopter crashed shortly before 7:00 p.m. approximately twenty miles south of Ainsworth, in inclement weather.  All aboard were killed.  Associated Aviation Underwriters, which insured Budden and Rodgers, settled the claims of the estates of the two nurses.  Associated Underwriters, Rodgers, and Budden's estate ("plaintiffs") then sued the United States under the Federal Tort Claims Act, 28 U.S.C. § 2671, seeking contribution as well as recovery for wrongful death and property damage. Plaintiffs alleged that the government was liable because Geranis did not give Budden an accurate weather forecast.  Specifically, they claimed that Geranis failed to describe weather conditions—icing and low cloud ceilings—which ultimately caused the crash.

Several witnesses saw or heard the helicopter just before the crash.  They testified that the helicopter maintained a constant cruising speed on a northwest course and did not appear to be turning.  The witnesses' estimates of the helicopter's altitude indicate that it was gradually descending.  Their estimates of visibility indicate that visibility may also have been decreasing along the helicopter's route.  Several witnesses testified that there was a freezing mist or drizzle as the helicopter passed.

Terry and Debbie Hollenbeck, whose ranch is four to five miles south of the crash site, were the last witnesses to see the helicopter.  The terrain along the helicopter's line of flight changes abruptly at their ranch, where hills replace the flat hayfields to the southeast.  Terry Hollenbeck testified that the helicopter's landing light was on when he first saw it but that it went off as the helicopter approached their house.  Debbie Hollenbeck testified that she turned off their yard light in order to see the aircraft better.  She also testified that, after the helicopter had disappeared from view, the noise from the aircraft changed, becoming "real loud" for two to three seconds.

Both sides presented evidence concerning the crash itself.  Plaintiffs' experts offered three possible explanations for the crash. First, ice buildup on the airframe and rotor system could have rendered the helicopter uncontrollable.  Plaintiffs suggested that the reports of icing conditions by witnesses on the ground corroborate this theory.  Alternatively, Budden could have experienced spatial disorientation, a condition in which a pilot cannot be sure of his aircraft's attitude, which could have caused him to become confused and lose control.  Several factors, plaintiffs suggested, could have contributed to spatial disorientation.  Ice accumulation on the windshield could have obscured Budden's vision.  Plaintiffs suggested that Budden intended to land, using the Hollenbeck's yard light as a reference point, but aborted the attempt when that light went off.  The sudden and apparently inexplicable loss of a ground reference point, combined with obscured vision, could have produced spatial disorientation.  Finally, Budden could have crashed because of some combination of ice buildup, limited vision and spatial disorientation.  Plaintiffs further suggested that the changing sound which Debbie Hollenbeck reported indicated some deviation from stable flight, which would be consistent with all three theories.

Plaintiffs' experts contended that, at the time of the crash, Budden could have been attempting to return to his last ground reference point to land.  They testified that the snow cover and precipitation would have made it very difficult for Budden to identify another place to land, especially in unfamiliar, hilly terrain.  Budden's landing light alone might not have enabled him to land because the light would have reflected from the precipitation and snow cover, effectively blinding him.

The government's expert testified that the aircraft's high speed and steep angle at impact indicate that Budden was not attempting to land. Also, the damage pattern of the rotors suggests that, at impact, they were turning at a rate commensurate with cruising speed, not landing speed. The expert explained that Budden may have turned his landing light on, not in preparation for landing, but to determine the type and amount of precipitation present. The government's expert also disputed plaintiffs' suggestion of ice accumulation. Photos taken the morning after the crash and before the temperature had risen above freezing showed no evidence of ice on the aircraft. In addition, the lack of temperature damage in the engine demonstrated that the helicopter did not become overloaded with ice. Finally, the government's expert discounted plaintiffs' spatial disorientation theory. He noted that the helicopter struck the ground with a slight yaw but no roll. This relatively stable attitude at impact indicates that Budden did not lose control of the aircraft.

The government's expert concluded that, just before the crash, Budden was only 100 to 200 feet above the ground. Because of the change in barometric pressure when Budden encountered the storm system, however, his altimeter would have shown him to be sixty feet higher than he actually was. The expert theorized that Budden encountered a low-lying cloud, described as a scud cloud, dove sharply to escape it, and crashed. He also contended that Budden, as a prudent pilot, should have either landed or turned around when he encountered the adverse weather conditions, especially as the flat terrain to the southeast of the Hollenbeck ranch offered numerous landing opportunities.

As indicated earlier, plaintiffs alleged that Geranis had responded inadequately to Budden's request for weather information. When Geranis briefed Budden, he had at least three sources of information available: the area forecast, the terminal forecast, and the transcribed weather broadcast (TWEB). Area forecasts address major weather patterns over large areas. The relevant area forecast included Broken Bow and Ainsworth. It predicted occasional rime icing from freezing level to 12,000 feet, spreading eastward, with a possibility of cloud ceilings below 1,000 feet. Terminal forecasts are provided for particular cities. The terminal forecasts for Grand Island, North Platte and Norfolk, towns to the south and east of Ainsworth and Broken Bow, called for a chance of three miles' visibility in light snow or fog, with occasional ceilings as low as 1,000–1,200 feet. TWEBs cover fifty-mile-wide flight corridors between specific locations. The two TWEB corridors that intersected Budden's intended route both forecasted visibility of less than three miles in light snow or freezing drizzle and occasional ceilings below 1,000 feet.

Geranis gave Budden information from the terminal forecast, but not from the area forecast or the TWEBs. Geranis testified that he did not provide Budden the area forecast because he thought that those conditions had moved to the east of Broken Bow and Ainsworth. He also believed that the terminal forecasts contained more current information. Geranis testified that he did not provide the information from the TWEB routes for several reasons. First, the same information appears in such other sources as the terminal and area forecasts. Second, because Geranis was generally not familiar with the cities in each TWEB corridor in western Nebraska, he would not have known which TWEB to consult unless the pilot specified its identification number, which Budden did not do. Finally, Geranis could not have been sure which portion of either TWEB affected Budden because each TWEB covered a long, narrow flight corridor and did not predict weather movement.

The district court concluded that Geranis was under no duty to relate the TWEB forecast to Budden because TWEBs are appropriate only when a pilot specifies a route and because the testimony at trial indicated that the TWEBs do not contain any information not otherwise available in some other form. It found that Geranis did, however, have a duty to inform Budden of the icing conditions described in the

area forecast. While Geranis's failure to describe the icing conditions "undoubtedly contributed to Budden's decision to commence the flight," the court found that this failure was not the proximate cause of the accident because icing itself did not cause the crash. Instead, the district court found that Budden had flown directly into the scud cloud buildup, attempted to duck out of it, and crashed because he was actually sixty feet lower than his altimeter indicated. The district court's ultimate finding was that:

> The expert testimony leads me to the conclusion that it was the pilot's continued flight into deteriorating weather conditions consisting of decreasing cloud ceilings and visibility, not icing, that caused this accident.

On appeal, plaintiffs do not challenge as clearly erroneous the district court's finding that the crash was not caused by the ice buildup on the airframe or ice covering the windshield. Rather, they contend that the district court erred in not finding that Geranis' failure to advise Budden of the forecast of ceilings below 1,000 feet constituted negligence that was the proximate cause of the accident. The government responds by arguing that plaintiffs never advanced during the trial the failure to warn of low ceilings as a cause of the crash and are therefore precluded from doing so for the first time on appeal.

■ Having carefully reviewed the record, we are satisfied that Geranis' failure to warn of the low ceilings forecast was sufficiently made an issue during the trial to warrant review on appeal. It is true beyond question that plaintiffs' principal theory of the case was that the crash was caused by icing conditions. Nevertheless, without recounting the numerous references to freezing drizzle and low ceilings during the trial and in plaintiffs' proposed findings and post-trial brief, we conclude that the issue of Geranis' failure to advise Budden of the area forecast of below 1,000 foot ceilings as a cause of the crash was made an issue that should have been addressed and resolved by the district court. Indeed, the government recognized as much when it stated in its Rule 41(b) motion to dismiss at the close of plaintiffs' case:

> Essentially there are two allegations, main allegations with some subsidiary allegations subsumed within them, but number one was that the ceilings below—occasional ceilings below 1,000 feet, that that forecast was not given to Mr. Budden. The next one is that there is a forecast of icing due to freezing drizzle, the allegation that that was not given to Mr. Budden, and should have been.

■ The question, then, is whether Geranis was under a duty to advise Budden of the low ceilings forecast. The government says no, but we do not agree.

Geranis himself adamantly took the position that he was unaware that Budden intended a flight between Broken Bow and Ainsworth and that therefore he (Geranis) was under no obligation to advise Budden of the weather between those two points. He testified that nonpilots frequently call in to the Flight Service Station to inquire about the weather at a particular location. He gave as an example of such a call the case in which someone might call in for weather information in anticipation of holding a picnic at that location. Geranis acknowledged that he had assumed that Budden was a helicopter pilot, but he steadfastly denied having any inkling that Budden planned to initiate a flight that would take him in a line of flight between Broken Bow and Ainsworth. That denial, however, is inherently inconsistent with the only logical implication of, and the obvious inference to be drawn from, Budden's question, "and were they ... expecting any significant weather moving through that area in the next hour and a half?" Why else would a helicopter pilot request such information if he was not intending to undertake a flight between Broken Bow and Ainsworth during that time frame? Geranis may not have known that Budden and his passengers were about to undertake a mission of mercy, but given the context of Budden's request for weather information, Geranis had no reasonable grounds to assume that

Budden's request was for a nonflight purpose.

We conclude that Geranis' duty to fully advise Budden of the weather conditions between Broken Bow and Ainsworth, including the forecast of ceilings below 1,000 feet, is clearly imposed by the Flight Service Handbook published by the Federal Aviation Administration. Paragraph 166 of the Handbook provides:

### TYPE OF BRIEFING TO BE CONDUCTED

Provide the pilot with the type briefing requested, i.e., standard, abbreviated or outlook. When it is not clear initially which type briefing is desired, provide the first one or two items requested, and then ask the pilot "Would you like a standard briefing?" If a standard briefing is requested, conduct the briefing in accordance with paragraph 167. If the pilot does not desire a standard briefing, conduct the briefing in accordance with paragraph 168 or 169.

Paragraph 167b(1) of the Handbook provides:

(b). Using all sources of weather and aeronautical information, provide the following data when it is applicable to the proposed flight. Provide items 1 through 8 in the sequence listed, except as noted.

(1) *Adverse Conditions*—Include this element when meteorological or aeronautical conditions are reported or forecast that might influence the pilot to alter the proposed flight. Emphasize conditions that are particularly significant such as low level wind shear; embedded thunderstorms; reported icing; frontal zones along the route of flight; airport closures; air traffic delays, etc. Weather advisories (WS, WA, WST, CWA, AWW) shall be given by stating the type of advisory followed by the pertinent information.

Paragraph 168 of the Handbook provides in part:

### CONDUCT OF ABBREVIATED BRIEFING

Provide an abbreviated briefing when a pilot requests information to supplement mass disseminated data; update a previous briefing; or when the pilot requests that the briefing be limited to specific information. Conduct abbreviated briefings as follows:

a. When a pilot desires specific information only, provide the requested information. If adverse conditions are present or forecast, advise the pilot of this fact. Provide details on these conditions in accordance with paragraph 167(b)(1) if the pilot requests that you do so.

As indicated above, the district court held that Geranis was under no duty to inform Budden of the contents of the relevant TWEBs. Because we agree with the district court that the area forecast included the information regarding the low ceilings and because whatever information the TWEBs may have contained regarding icing conditions has been rendered moot by the district court's finding the crash was not caused by ice, we deem it unnecessary to rule on this issue.

We believe that Budden's request for the latest reported weather for Broken Bow and Ainsworth, immediately followed by his inquiry whether any significant weather would be moving through that area in the next hour and a half, was a specific inquiry into weather conditions along his proposed route of flight. In *Norwest Capital Management & Trust Co. v. United States*, 828 F.2d 1330 (8th Cir.1987), the pilot called a flight service specialist for a flight clearance and then asked, "What have you got up there?," to which the specialist replied, "Oh we've got the sky partially obscured estimated seven hundred broken three thousand overcast three miles." *Id.* at 1333. The pilot then asked for conditions reported in Casper and Rock Springs, Wyoming, and asked the specialist to recheck winds aloft at 9000 feet. We held that "By inquiring into these weather conditions, [the pilot] went beyond a mere request for clearance ... and thus imposed

an additional duty upon [the flight specialist] to provide him with pertinent weather conditions relative to his flight, especially adverse and potentially dangerous conditions such as icing." *Id.*

Although we acknowledge that the pilot in *Norwest Management* had informed another flight specialist some two hours earlier about his planned departure at 6:00 a.m. that day and that the second flight specialist was aware of his predecessor's preflight briefing log, *id.* at 1332, we are nonetheless of the opinion that Budden's request for present and future weather conditions in the Broken Bow–Ainsworth area was sufficiently specific to impose a duty upon Geranis to advise Budden of the forecast of the below 1000 feet ceilings for that area.

We believe that what we said in *Norwest Management* applies with equal force in this case: "'[s]ince the FAA has undertaken to advise requesting pilots of weather conditions, thus engendering reliance on facilities such as the Indianapolis FSS, it is under a duty to see that the information which it furnishes is accurate and complete.'" *Id.* at 1333 (quoting *Pierce v. United States*, 679 F.2d 617, 621 (6th Cir. 1982)). The standard of care set forth in *Norwest Management* imposed a duty upon Geranis to advise Budden that the area forecast called for occasional ceilings below 1000 feet in the Broken Bow–Ainsworth area, and the district court erred in failing to find that Geranis was negligent in not giving Budden this information.

The government responds to plaintiff's call for such a holding by arguing that Budden's conduct in flying into weather conditions different from those that he was advised of in the forecast was an intervening cause that broke the causal connection between Geranis' failure to warn of the low ceiling forecast and the resulting crash. Further, the government argues that the district court's findings regarding Budden's actions amount to a finding of negligence on Budden's part. These arguments may ultimately be well taken by the district court on remand, applying, as it will be required to do by 28 U.S.C. § 1346(b), Ne-

braska law governing questions of proximate cause, intervening cause, and Budden's negligence (if any). With respect to the question of Budden's negligence, we note that even one of the government's witnesses acknowledged that he could not fault Budden for having taken off from Kearney on the basis of the information that he had been given by Geranis. Whether, when viewed in the light of the emergency call that he and his nurse-passengers were responding to, Budden was negligent in not taking a different course of action once he encountered the low ceilings, and whether that negligence should bar any recovery in this action, are questions of fact for the district court to resolve on remand.

The judgment is vacated, and the case is remanded to the district court for further proceedings in accordance with the views set forth in this opinion.