# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 08-2680

_____

Rick Glorvigen, as Trustee for the     *
Next of Kin of Decedent James     *
Kosak,     *
    *
      Plaintiff - Appellee,     *
    *
      v.     *
    *
Cirrus Design Corporation,     *
    *
      Defendant - Appellant,     *
    *
Estate of Gary R. Prokop, By and     *
Through Katherine Prokop as     *
Personal Representative,     *
    *
      Defendant - Appellee.     *
    *
_____     *
    *    Appeal from the United States
Thomas M. Gartland, as Trustee     *    District Court for the
for the Next of Kin of Gary R.     *    District of Minnesota.
Prokop, Deceased,     *
    *
      Plaintiff - Appellee,     *
    *
      v.     *
    *
Cirrus Design Corporation,     *
    *
      Defendant - Appellant.     *
_____     *

```
                                       *
Cirrus Design Corporation,             *
                                       *
        Third Party Plaintiff - Appellant,  *
                                       *
        v.                             *
                                       *
United States of America,              *
                                       *
        Third-Party Defendant - Appellee. *
```

_____

Submitted: May 14, 2009
Filed: September 16, 2009

_____

Before LOKEN, Chief Judge, EBEL[*] and CLEVENGER[**], Circuit Judges.

_____

EBEL, Circuit Judge.

On January 18, 2003, at 6:38 a.m., a Cirrus SR-22 aircraft with identification number N9523P crashed near Hill City, Minnesota. The pilot and owner of the aircraft, Gary Prokop, and his passenger, James Kosak, were both killed in the crash. Their trustees, Thomas Gartland and Rick Glorvigen, appointed under the Minnesota wrongful-death statute, brought claims against Cirrus, the airplane manufacturer, alleging, among other things, that Cirrus had improperly designed the airplane and had failed to instruct Mr. Prokop properly in its operation. Cirrus then brought a third-party complaint against two federally employed flight service station ("FSS")

_____

[*] The Honorable David M. Ebel, United States Circuit Judge for the Tenth Circuit Court of Appeals, sitting by designation.

[**] The Honorable Raymond C. Clevenger III, United States Circuit Judge for the Federal Circuit Court of Appeals, sitting by designation.

-2-

specialists for negligence, alleging, among other things, that they were at fault for failing negligently to apprise Mr. Prokop adequately of the weather conditions and weather forecast the morning of the crash. Acting pursuant to the Federal Tort Claims Act, the United States certified that these Specialists had been acting in the scope of their employment at the time of this incident and, based on that certification, the court substituted the United States as the sole third-party defendant, in place of the two FSS specialists, and removed the case to federal court. See Glorvigen v. Cirrus Design Corp., No. 06-2661, 2006 WL 3043222 *1-*2 (D. Minn. Oct. 24, 2006) (unpublished).

After the case was removed to federal court, the United States moved for summary judgment, arguing that the FSS specialists had not been negligent in briefing Mr. Prokop and that, even if they were negligent, that negligence did not cause the crash. The district court granted the United States's motion for summary judgment and remanded the remaining issues to the Minnesota state courts.

On appeal, Cirrus challenges both the grant of summary judgment for the United States and the order remanding the remaining issues to state court. Neither of the initial plaintiffs has weighed-in on the grant of summary judgment for the United States. Thomas Gartland, the trustee of Mr. Prokop's wrongful death estate, filed a brief addressing the remand issue urging only that this court affirm the district court's decision to remand the remaining issues to state court.

We hold that neither specialist was negligent in providing weather information to Mr. Prokop. Accordingly, we affirm the district court's grant of summary judgment for the United States. Since we hold that the specialists were not negligent, we do not reach the separate question of causation. We also affirm the district court's decision remanding the remaining issues to the Minnesota state courts.

## I. Background

The following factual summary is based on facts "which are either undisputed or viewed in a light most favorable to" the non-moving third-party plaintiff Cirrus. Vaughn v. Ruoff, 253 F.3d 1124, 1127 (8th Cir. 2001).

On January 18, 2003, amateur pilot Gary Prokop and his passenger, James Kosak, attempted to fly from Grand Rapids, Minnesota, to St. Cloud, Minnesota, in order to see their sons play in an early-morning hockey game. The flight appears to have started smoothly. They took off at 6:30 a.m., and the plane climbed fairly steadily to about 3300 feet above mean sea level ("MSL"). However, the plane then began moving up and down erratically, and Mr. Prokop apparently attempted to turn it around. Those last-ditch efforts proved to be of no avail; the plane crashed into the ground at 6:38 a.m., killing both its occupants.

### A. Mr. Prokop's Qualifications as a Pilot

Gary Prokop was certified to fly in "Visual Flight Rules" ("VFR") conditions only. In other words, he was not trained to fly simply by reading the instruments (also called "Instrument Flight Rules" or "IFR") and, therefore, could only fly when visibility was fairly good.

A VFR pilot is only permitted to fly if visibility is at least three miles and cloud "ceilings" are at least 1,000 feet above ground.[1]  See Webb v. United States, 840 F.

---

[1] A cloud "ceiling" is defined as the lowest elevation at which the sky is more than 50% covered by clouds. In meteorological terms, a cloud cover that is "few" or "scattered" describes cloud conditions that cover less than 50% of the sky. Therefore, you could have "scattered" clouds below 1,000 feet, but still have VFR or MVFR [marginal VFR] conditions. On the other hand, cloud conditions that are "broken" or

(continued...)

Supp. 1484, 1490 (D. Utah 1994). Additionally, when flying at night, a VFR pilot flying in the sort of airspace Mr. Prokop flew in that morning—Class E and Class G airspace—must maintain a minimum distance of 500 feet below any clouds, 1,000 feet above any clouds, and 2,000 feet horizontally from any clouds. See 14 C.F.R. § 91.155(a). The sun did not rise that morning until 7:54 a.m., so it was still nighttime when the crash occurred.

Mr. Prokop had logged a total of 248.0 hours of flight time, only 18.9 of which were in an SR-22, the type of plane he flew the morning of the crash. To ensure that he only flew in conditions he was prepared to handle, Mr. Prokop and his flight instructor developed a set of "personal minimums." Personal minimums set forth guidelines for the weather conditions in which a pilot will fly that are more restrictive than the legal weather minimums for VFR flight. Mr. Shipek, Mr. Prokop's Cirrus flight instructor, advised Mr. Prokop to maintain personal weather minimums of 3,000-4,000 foot ceilings and visibility of at least 4-5 miles. Further, Mr. Shipek advised Mr. Prokop not to fly at night when there was snow on the ground because it is difficult in those conditions to distinguish between clouds and the snow-covered ground. The parties agree that the weather reports that morning called for at least some ceilings below 3,000 feet, some areas of visibility below four miles, and that it was still dark with snow on the ground when Mr. Prokop crashed.

### B. The Weather Briefings

Mr. Prokop received two weather briefings before he began his flight. He received his first briefing, from FSS Specialist Havelka, at 4:55 am. He called in again for an "abbreviated briefing" from FSS Specialist Hertzog at 5:41 a.m. The relevant

---

[1](...continued)
"overcast" describe clouds that cover more than 50% of the sky, and "broken" or "overcast" conditions below 1,000 feet will render conditions IFR.

portions of both of these briefings are reproduced in full in the district court's opinion, so we will only briefly recount the most important portions here.

Specialist Havelka told Mr. Prokop there was an AIRMET for the area warning of "the potential for some i f r."[2] (Aplt. Appx. at 557.) He conveyed the content of a recent METAR[3] for Grand Rapids, reporting visibility of three miles and ceilings of 1,300 feet. He further stated that "the forecast for [the Grand Rapids airport] . . . through six or so ah occasional lower stratus and possible light snow[.] [A]s the day goes on conditions are expected to become about five to six thousand scattered to broken." (Aplt. Appx. at 557.) He continued to give Mr. Prokop information about other "lower stratus" clouds around the nearby Aitkin and Brainerd airports, the forecast for the St. Cloud airport, where Mr. Prokop had planned to land, as well as some additional information. (Id.) Finally, he advised Mr. Prokop that "it looks like ah you know if you waited a couple hours ceilings should lift some for ya." (Id.)

Mr. Prokop received his second briefing, from FSS Specialist Hertzog, at 5:41 a.m. Early in the briefing, Mr. Prokop mentioned that he had already received a

---

[2] "AIRMETs" are

[i]n-flight weather advisories issued only to amend the area forecast concerning weather phenomena which are of operational interest to all aircraft and potentially hazardous to aircraft having limited capability because of lack of equipment, instrumentation, or pilot qualifications. . . . AIRMETs cover . . . widespread areas of ceilings less than 1,000 feet and/or visibility less than 3 miles.

Fed. Aviation Admin., Aeronautical Information Manual: Official Guide to Basic Flight Information and ATC Procedures, at PCG A-5 (2002). (Aplt. App. at 432, 459.) There are three types of AIRMETs. Most relevant to this case, an "AIRMET Sierra describes IFR conditions and/or mountain obscurations." (Id. at 446.)

[3] A METAR is a report of weather conditions at an airport at a given time.

briefing that morning, after which Mr. Hertzog offered to give him an "abbreviated briefing," and Mr. Prokop agreed that he only wanted an abbreviated briefing. Nonetheless, the briefing contained a lot of the information conveyed in the earlier full briefing. For example, Specialist Hertzog warned Mr. Prokop of "the airmet for i f r" that Specialist Havelka had mentioned. (Aplt. Appx. at 587.) However, he indicated that although there were some reports of "marginal" conditions at Grand Rapids and low visibility at the Aitkin airport, there were no reports of actual IFR conditions along Mr. Prokop's route at that time. (Id.) Finally, he informed Mr. Prokop that there were no relevant pilot reports, and updated him on the current conditions at the airports near his route.

## C. The District Court's Decision

The district court[4] held that, although the Specialists could have given Mr. Prokop some additional information, neither of them breached his duty of care to Mr. Prokop. The district court held, in the alternative, that any breach of the duty of care in the briefings could not have been a substantial cause of the accident.

In a separate order, the district court remanded this case to the state courts. The district court found that, after dismissing Cirrus's case against the United States, there were no remaining federal questions justifying the continued attention of the federal courts. Further, after weighing factors of "judicial economy, convenience, fairness, and comity," the district court determined that remand was appropriate in part because "the Court's denial of summary judgment in favor of Cirrus primarily involved a legal analysis, and the Court's fact-intensive analysis was centered not on the remaining claims against Cirrus but on Cirrus's claims against the Government." Glorvigen v. Cirrus Design Corp., No. 06-2661 (Doc. 168 at 4) (D. Minn. June 24, 2008).

---

[4] The Honorable Paul A. Magnuson, United States District Court Judge for the District of Minnesota, presiding.

## II. Analysis

### A. Jurisdiction

The original plaintiffs and Cirrus do not have complete diversity of citizenship, and the original complaints do not raise any questions of federal law. Those complaints were, accordingly, filed in state court. Cirrus then filed a third-party complaint against two federally employed Specialists and, pursuant to 28 U.S.C. § 2679(d)(2), the United States was substituted for those Specialists as a party to this case. Section 2679(d)(2) further provides that, once the United States is substituted as a party in a case involving its employees' negligence, the case "shall be removed without bond at any time before trial by the Attorney General to the district court of the United States for the district and division embracing the place in which the action or proceeding is pending." Id. The district court had subject-matter jurisdiction over Cirrus's claims against the United States pursuant to 28 U.S.C. § 1346(b)(1) (stating, in pertinent part, that the federal courts "shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, . . . for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment"). And the federal court had supplemental jurisdiction over the state-law claims under 28 U.S.C. § 1367(a).

This court has jurisdiction to review the district court's decision to remand the state-law claims back to state court. See Carlsbad Tech., Inc. v. HIF Bio, Inc., 129 S. Ct. 1862, 1864-65 (2009) (holding federal court of appeals has jurisdiction to review district court's decision not to exercise supplemental jurisdiction over state-law claims, but instead to remand those claims to state court).

This court also has jurisdiction, pursuant to 28 U.S.C. § 1291, to review the district court's decision granting summary judgment for the United States when the rest

of the case is remanded. "An order is severable from a remand order and subject to appellate review [under § 1291] if (1) it precedes the order of remand 'in logic and in fact' and was issued while the district court had control of the case, and if (2) the order sought to be separated is 'conclusive.'" Carlson v. Arrowhead Concrete Works, Inc., 445 F.3d 1046, 1052 (8th Cir. 2006) (quoting City of Waco v. United States Fid. & Guar. Co., 293 U.S. 140, 143 (1934)). Here, the district court's decision granting the United States summary judgment did precede, and in fact precipitated, the court's order remanding the remaining state-law claims to the Minnesota courts. And this summary judgment decision is separate from those state-law claims, conclusively resolving instead the FTCA claims against the United States. See id. at 1053 (noting "[a] federal court's ruling is conclusive if it is functionally unreviewable in state court," citing, e.g., City of Waco, 293 U.S. at 143, and affected the parties' substantive rights).

## B. Standard of Review

This court reviews the grant of summary judgment de novo, applying the same standards as the district court. Summary judgment is affirmed if, viewing the evidence most favorably to the non-moving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Summary judgment is not appropriate if the prima facie case is supported by specific facts sufficient to raise a genuine issue for trial. This court accepts as true all facts presented to the district court by the non-moving party, if properly supported by the record.

Thompson v. Hirano Tecseed Co., 456 F.3d 805, 808 (8th Cir. 2006) (citations omitted). It was the United States, as the moving party, which bore "the initial burden of informing the district court of the basis for its motion, and identifying those portions of the pleadings," the discovery, disclosure materials and affidavits "which it believes demonstrate the absence of a genuine issue of material fact." Celotex v. Catrett, 477 U.S. 317, 323 (1986). But having met that burden, it was left to Cirrus, as the party

with the burden of proof at trial, see, e.g., Wear v. Buffalo-Red River Watershed Dist., 621 N.W.2d 811, 813 (Minn. Ct. App. 2001), to present sufficient evidence to establish the elements essential to its claims. See Celotex, 477 U.S. at 322-23. Thus, Cirrus, even though the non-moving party for summary-judgment purposes, "must still 'present[] evidence sufficiently supporting the disputed material facts [such] that a reasonable jury could return a verdict in [its] favor.'" Pope v. ESA Servs., Inc., 406 F.3d 1001, 1003-04 (8th Cir. 2005) (quoting Gregory v. City of Rogers, 974 F.2d 1006, 1010 (8th Cir. 1992)). The fact that, at trial, this case would be decided by a judge, not a jury, see 28 U.S.C. § 2402, does not increase the deference we give to the district court's decision at summary judgment. See Med. Inst. of Minn. v. Nat'l Ass'n of Trade & Tech. Sch., 817 F.2d 1310, 1315 (8th Cir. 1987).

We review the district court's decision not to exercise supplemental jurisdiction over the remaining state-law claims for an abuse of discretion. See Carlsbad Tech., 129 S. Ct. at 1867.

## C. The FSS Specialists' Duties

This negligence case is governed by Minnesota law. See Budden v. United States, 15 F.3d 1444, 1449 (8th Cir. 1994) ("Budden II") ("Courts decide FTCA claims under the law of the state where the tort occurred.") (citing 28 U.S.C. § 1346(b)). Under Minnesota law, "[n]egligence requires '(1) the existence of a duty of care; (2) a breach of that duty; (3) an injury; and (4) the breach of the duty being the proximate cause of the injury.'" MSK EyEs Ltd. v. Wells Fargo Bank, 546 F.3d 533, 545 (8th Cir. 2008) (quoting Engler v. Ill. Farmers Ins. Co., 706 N.W.2d 764, 767 (Minn. 2005)).

Although state law governs in FTCA cases, because the federal courts have exclusive jurisdiction over such claims, see 28 U.S.C. § 1346(b)(1), the Minnesota courts have not had an opportunity to analyze the scope of the duties that FSS

specialists owe to pilots and passengers. Therefore, like other federal courts addressing similar claims, we are forced to look primarily to other federal cases for guidance on this question. See, e.g., Pierce v. United States, 679 F.2d 617, 620-21 (6th Cir. 1982) (relying on federal cases to support the conclusion that FSS specialists have the "duty . . . to advise [pilots] accurately of known and predicted weather conditions," although the case was actually governed by Indiana law); Gill v. United States, 429 F.2d 1072, 1075 (5th Cir. 1970) (citing federal cases in support of the court's analysis of an air traffic controller's duties, and noting that "[w]hile principles of Texas law control, federal regulations may impose duties and standards of conduct upon the actors").

FSS specialists have a duty to provide pilots with an accurate and complete summary of the relevant weather information. This court has quoted with approval the Sixth Circuit's statement that "'[s]ince the FAA has undertaken to advise requesting pilots of weather conditions, thus engendering reliance on facilities such as the Indianapolis FSS, it is under a duty to see that the information which it furnishes is accurate and complete.'" Norwest Capital Mgmt. & Trust Co. v. United States, 828 F.2d 1330, 1333 (8th Cir. 1987) (quoting Pierce, 679 F.2d at 621 (6th Cir.)) (emphasis added); see also Budden v. United States, 963 F.2d 188, 194 (8th Cir. 1992) ("Budden I") (quoting with approval the standard articulated in Norwest Capital); Aplt. Br. at 29 (noting that the "Government agrees that the FAA, through its FSS specialists, has assumed a general duty to provide 'accurate and complete weather briefings to pilots'") (quotation omitted). These duties are rooted in both the FAA manual that instructs specialists on how to conduct their briefings, and on the reliance that pilots and airplane passengers place on the FAA. See Tinkler v. U.S. by F.A.A., 982 F.2d 1456, 1461 (10th Cir. 1992) ("[FSS Specialist's] duty arose from both the dictates of the *Flight Services Manual* as well as the reliance pilots place on FSS briefers."); Moorhead v. Mitsubishi Aircraft Int'l., Inc., 828 F.2d 278, 282 n.13 (5th Cir. 1987) (stating that an FSS Specialist's duties are "rooted in both general pilot reliance for the service, and the briefers' manual") (citation omitted).

-11-

Although an FSS specialist must provide "accurate and complete" weather information, a specialist does not need to recite verbatim the contents of every weather report before him. See Moorhead, 828 F.2d at 282 (noting that "[b]riefers are instructed not to read weather reports and forecasts verbatim, unless it is specifically requested by the pilot"). In fact, a verbatim recitation would likely overwhelm a pilot with information, thereby confusing rather than clarifying the prevailing weather conditions. Further, a verbatim recitation would make FSS specialists superfluous, since the rote recitation of weather reporting information could probably be accomplished more effectively through the use of a computer or automated phone system. Therefore, our statement that a specialist must provide "accurate and complete" weather information does not mean that a specialist must provide a pilot with every detail from every relevant weather source. Rather, it means that the specialist must provide a complete synthesis or summary of the relevant weather information. Inevitably, therefore, some information will be left out. However, as a synthesis, it must be "accurate and complete" with regards to the information that would appropriately be included in a summary report. The material information must be included, but additional details or repetitive facts may be left out.

**D.  Specialist Havelka Provided Mr. Prokop with an Accurate and Complete Summary of the Relevant Weather Information**

The undisputed facts establish that Specialist Havelka properly apprised Mr. Prokop of the relevant weather information the morning of his flight. Among other things, he warned Mr. Prokop of the possibility that he would encounter IFR conditions, accurately conveyed the current conditions and forecast for the Grand Rapids airport (where Mr. Prokop's flight began), provided the current conditions and forecast for the St. Cloud airport (where Mr. Prokop hoped to land), and provided additional information about conditions along Mr. Prokop's intended route.

At 2:45 a.m. on the morning of the crash, an AIRMET Sierra, which indicates IFR conditions, was issued calling for "[o]ccasional ceiling below 1,000 feet/visibility below 3 miles" through 9:00 a.m. (Aplt. Appx. at 546); in other words, occasional IFR conditions. Specialist Havelka conveyed the information contained in the AIRMET Sierra by telling Mr. Prokop there was an AIRMET for the area warning of "the potential for some i f r." (Id. at 557.) Specialist Havelka did not need to state explicitly that this AIRMET called for occasional ceilings below a thousand feet and visibility below three miles. Every VFR pilot should be familiar with the VFR cutoffs, and it would be gratuitous and counter-productive to demand that FSS specialists reiterate those cutoffs during every VFR weather briefing. Thus, Mr. Havelka's statement that there was an AIRMET warning of potential IFR conditions along Mr. Prokop's flight was sufficient to convey the fact that the AIRMET called for occasional ceilings below a thousand feet and/or visibility below three miles and, if Mr. Prokop wanted more details or clarification, the onus was on him to request them. Cf. Moorhead, 828 F.2d at 282 (noting that weather "[b]riefers are instructed not to read weather reports and forecasts verbatim, unless it is specifically requested by the pilot"); (see also Affidavit of Cirrus's Expert, W. Jeffery Edwards, Aplt. Appx. at 397 (agreeing that "[i]f Mr. Prokop did not understand what the briefers were saying to him, it was his responsibility to say so and ask for clarification").

Cirrus argues that Specialist Havelka was negligent in describing the warnings provided by this AIRMET Sierra in part because Havelka stated that there was a "potential for" IFR conditions, and that he should, instead, have informed Mr. Prokop that occasional IFR conditions had been forecast. The FAA's internal memos define the term "occasional" to describe conditions where "there is a greater than 50% probability of a phenomenon occurring, but for less than ½ the forecast period." (Aplt. Appx. at 74.) This AIRMET was in effect from 2:45 a.m. through 9:00 a.m. Specialist Havelka's warning of the "potential for" IFR along Mr. Prokop's route sufficiently conveyed the AIRMET's warning of a greater than 50% chance of IFR conditions for

-13-

less than half the time between 2:45 a.m. and 9:00 a.m. over the area covered by the AIRMET.

Specialist Havelka also accurately conveyed the forecast for the Grand Rapids airport, stating that Grand Rapids would have "occasional lower stratus [clouds] and possible light snow" through 6:00 a.m., but that the ceilings were predicted to lift to "about five to six thousand [feet]" later in the day. (Id. at 557.)

Specialist Havelka's description of the forecast for Grand Rapids was based, at least in part, on the Area Forecast. An Area Forecast predicts "general weather conditions over an area the size of several states." (Id. at 162.) The "Chicago Area Forecast" covers the location of Mr. Prokop's proposed flight, as well as Illinois, Wisconsin, the entire state of Minnesota, and other locations. The Aviation Weather Center issued a Chicago Area Forecast at 4:45 a.m., approximately ten minutes before Mr. Prokop's first briefing. That forecast called for "[c]eiling overcast to broken at 1,500 feet to 2,500 feet, tops 5,000 feet." (Id. at 547.) Although Specialist Havelka did not specify the precise ceiling levels predicted by the Area Forecast, his description to Mr. Prokop of "occasional lower stratus" clouds (Id. at 557), was sufficient to convey the material information contained in the Area Forecast, given that the forecast did not predict ceiling levels below 1,000 feet.

Specialist Havelka also based his forecast for Grand Rapids on airport-specific forecasts, or TAFs, for two nearby airports, Hibbing and Brainerd. Brainerd's forecast called for "visibilities of four statute miles in light snow with ceilings broken to 1500" until 7:00 a.m. with visibility of six miles and scattered clouds at 5,000 feet afterwards. (Id. at 157-58). Hibbing's forecast called for more than six miles of visibility and scattered clouds at 6,000 feet. These forecasts predicted conditions well within the VFR range, and Specialist Havelka's description of "occasional lower stratus" clouds through 6:00 a.m. is clearly defensible in light of the forecasts for those nearby airports.

-14-

Specialist Havelka also accurately described the current conditions at the Grand Rapids airport. Cirrus's meteorological expert, Dr. Elizabeth Austin, submitted a report concerning the briefings that Mr. Prokop received that morning and the weather that day. She stated that the "surface weather conditions at Grand Rapids" were, inter alia, "<u>Visibility</u>: 3 statute miles;" "<u>Sky Cover</u>: 100 feet Scattered, 1,300 feet Broken, 2,900 feet Overcast." (<u>Id.</u> at 81, 91.) These descriptions precisely mirror the account that Specialist Havelka conveyed to Mr. Prokop. Havelka stated that "grand rapids is . . . visibility three [miles] one hundred scattered [clouds] thirteen hundred broken [clouds] and twenty nine hundred overcast." (<u>Id.</u> at 557.) By Cirrus's expert's own account, Specialist Havelka could not have provided a more accurate description of the cloud conditions in Grand Rapids.[5]

Finally, Specialist Havelka accurately conveyed the current conditions at airports along Mr. Prokop's route and the current conditions and forecast for the St. Cloud airport (Mr. Prokop's intended destination), and informed Mr. Prokop that some lights were out at the St. Cloud airport. He closed by giving Mr. Prokop an opportunity to request any additional information, suggesting that the ceilings would likely lift if Mr. Prokop "waited a couple hours" (<u>id.</u> at 557), and instructing Mr. Prokop to "call back before [he left] and get an updated briefing." (<u>Id.</u> at 558.)

Therefore, Specialist Havelka did not breach his duty to provide Mr. Prokop with an "accurate and complete" summary of weather information.

------

[5] Another expert testifying for Cirrus acknowledged that all the information Specialists Havelka and Herzog provided was accurate. That expert opined that "[w]hat [Specialist Havelka] didn't provide [Mr. Prokop] was a problem." (Aplt. Appx. at 309.) As discussed above, however, a specialist need not provide a pilot with every detail of every report, and none of Cirrus's experts were able to identify any clearly pertinent information that Specialist Havelka failed to provide Mr. Prokop.

-15-

**E. Specialist Hertzog's Abbreviated Briefing Accurately Conveyed the Relevant Weather Information to Mr. Prokop**

Mr. Prokop called the FSS for a second briefing at 5:41 a.m., and spoke with FSS Specialist Hertzog. Early on in the briefing, Mr. Prokop mentioned that he had "called earlier." (Id. at 585.) That statement made it clear to Specialist Hertzog that Mr. Prokop had already received a briefing that morning. It was entirely appropriate, therefore, for Specialist Hertzog to ask if Mr. Prokop wanted a standard briefing, or if an abbreviated briefing would be sufficient. See Budden I, 963 F.2d at 193 ("When it is not clear initially which type of briefing is desired, provide the first one or two items requested, and then ask the pilot: "Would you like a standard briefing?" (quoting Fed. Aviation Admin., Flight Service Handbook, ¶ 166)). Mr. Prokop indicated that an abbreviated briefing would be sufficient, thereby limiting Specialist Hertzog's duties to providing an abbreviated briefing.

An abbreviated briefing intended to update a prior briefing should be focused, "to the extent possible, [on] appreciable changes in the meteorological and aeronautical conditions since the previous briefing." Webb v. United States, 840 F. Supp. 1484, 1492 (D. Utah 1994); see also Fed. Aviation Admin., Order 7110.10P, ¶ 3-2-2.b (Feb. 21, 2002), Aplt. Appx. at 648, 657). If the pilot requests specific information only, the specialist must provide that information, and in addition must "inform the pilot of the existence of any adverse conditions," Tinkler, 982 F.2d at 1462, "reported or forecast," Order 7110.10P, ¶ 3-2-2.a, Aplt. App. at 657).

In this case, Mr. Prokop requested an update briefing as well as specific information about current conditions in St. Cloud and the availability of any pilot reports. Therefore, Specialist Hertzog was required to inform Mr. Prokop of any significant changes in forecast or current conditions that arose since his last briefing, to describe the current conditions in St. Cloud, to inform Mr. Prokop of any relevant pilot reports, and to describe any adverse conditions that were present or forecast from

Grand Rapids to St. Cloud or reported in any pilot reports. We hold that Specialist Hertzog adequately fulfilled these responsibilities.

In fact, Mr. Hertzog may have provided Mr. Prokop more detail than required. For example, despite the fact that the AIRMET warning of the possibility of IFR conditions had not been amended since Mr. Prokop's earlier briefings, Mr. Hertzog warned Mr. Prokop that the AIRMET was still in effect for the entire state. Similarly, although conditions had improved at Grand Rapids since Mr. Prokop's first briefing, Specialist Hertzog warned him that there were still some "marginal" conditions there.

Towards the end of the briefing, Specialist Hertzog provided some updates of conditions at nearby airports. In that context, he stated that "at Aitkin it gets ah marginal with visibility they were down to three now they're up a little bit more . . . ah Aitkin now is up to (unintelligible) new report just came in they're up to seven mile visibility with ceilings three thousand two hundred overcast some lower scattered layers below that." (Aplt. Appx. at 587.) At that point, Mr. Prokop interjected, stating, "okay well good that's improving a little bit ha." (Id.) To which Mr. Hertzog replied, "Ya and over in the maple lake area . . . ." (Id.)

Cirrus argues that Specialist Hertzog was negligent for confirming Mr. Prokop's statement that conditions were improving. Cirrus apparently interprets Mr. Prokop's statement that conditions were improving to mean that the overall weather forecast was improving. However, Mr. Prokop stated that conditions were improving immediately after Specialist Hertzog noted that a new report indicated that conditions at Aitkin were quite good and, in fact, it is undisputed that those conditions were an improvement over the previous forecast. Thus, it is more likely that Mr. Prokop was merely referring to that new report—not the overall weather report—when he stated, and Specialist Hertzog confirmed, that conditions were "improving a little bit." (Id.)

Further, even if that exchange was referring to an improvement in overall weather conditions, Cirrus has failed to provide evidence indicating that overall conditions had not improved. In fact, a brief comparison of some of the prevailing weather conditions indicates that conditions had improved. The ceiling at Grand Rapids had lifted from 1300 feet at the time of the first briefing to 2800 feet at the time of the second briefing. Similarly, visibility at Aitkin, a nearby airport, had improved from five to seven miles. Conditions at Brainerd, another nearby airport, had deteriorated a little, but the Princeton and Maple Lake airports had both improved significantly. Thus, it would not have been error to state that conditions were improving. Further, even if the textual reports did not indicate improvement, Specialist Hertzog testified that, aside from the textual weather reports, he also looked at a "loop of the weather depiction screen" that indicated that the IFR areas were shrinking and VFR areas expanding over time. (Id. at 601-04.) His testimony is further corroborated by the fact that, about a half hour after this briefing, an updated AIRMET Sierra was issued removing the entire area of Mr. Prokop's flight route from its prior IFR warning.[6] Thus it appears that conditions that morning were, in fact, improving, and Cirrus has provided no evidence to the contrary.

Cirrus also argues that Specialist Hertzog was negligent for failing to inform Mr. Prokop that he would likely violate cloud clearance minimums by flying at his expected altitude of 2500 feet above mean sea level ("MSL"). Federal regulations provide that even if cloud ceilings and visibility are within the range in which a VFR pilot is allowed to fly, the pilot must also ensure that, when flying at night (i.e., in the dark), he maintains a minimum distance of 500 feet below any clouds, 1,000 feet above any clouds, and 2,000 feet horizontally from any clouds. See 14 C.F.R. § 91.155(a).

---

[6] Of course, Specialist Hertzog did not know, at the time of this briefing, that the AIRMET warning of IFR would be updated to indicate that IFR conditions were no longer predicted. However, that fact supports the accuracy of Specialist Hertzog's interpretation of the other relevant weather information as indicative of steady improvement.

Cirrus is correct that at 2500 MSL, Mr. Prokop would have likely been too close to some of the clouds on his route. Cirrus fails, however, to provide any evidence that Mr. Prokop actually intended to fly at that altitude. Mr. Prokop never indicated a specific expected altitude, and Specialist Hertzog's only intelligible remark on the subject was, "anything anything you can get ha," (Aplt. Appx. at 584), to which Mr. Prokop replied, "yep ya." (Id.) Specialist Hertzog then typed "2500" into his computer before receiving the weather report for Mr. Prokop's route, but Cirrus has provided no explanation for that entry. Cirrus has failed, therefore, to provide evidence that Specialist Hertzog actually expected Mr. Prokop to fly at 2500 feet MSL, so Specialist Hertzog was not negligent for failing to inform Mr. Prokop that he may violate federal regulations by flying at that particular altitude.

Therefore, Specialist Hertzog also did not breach his duty to provide Mr. Prokop with "accurate and complete" weather information.

**F. Neither Specialist was Negligent for Failing to Give Mr. Prokop a "Visual Flight Not Recommended" ("VNR") Warning**

The Federal Aviation Administration instructs FSS specialists to give a VNR recommendation when, "in [their] judgment, [conditions] would make flight under visual rules doubtful." See Order 7110.10P, ¶ 3-2-1(b)(2), Aplt. App. at 655. This is followed by a note stating that "[t]his recommendation is advisory in nature. The decision as to whether the flight can be conducted safely rests solely with the pilot." Id. We hold that neither specialist breached a duty to provide a VNR recommendation.[7]

---

[7] Neither party has addressed whether a specialist providing an abbreviated briefing has the duty to provide a VNR recommendation in certain circumstances. Order 7110.10P discusses the provision of a VNR recommendation in the context of standard briefings only. However, at least one court has held that a specialist providing an abbreviated briefing can be negligent for failing to give a VNR

(continued...)

Summary judgment for the United States was appropriate because the current and forecast weather conditions that morning were not so extreme that a failure to give a VNR recommendation constituted negligence. Compare Davis v. United States, 824 F.2d 549, 554 (7th Cir. 1987) (affirming district court's decision that an FSS specialist was not negligent for failing to provide a VNR warning where the relevant forecasts predicted VFR conditions), with Webb, 840 F. Supp. at 1518 (holding that a specialist was negligent for failing to give VNR recommendation where weather conditions were currently VFR but "barely met legal VFR minimums," and were fluctuating rapidly). Cirrus has failed to provide evidence supporting its claim that either Specialist Havelka or Specialist Hertzog had a duty to provide a VNR recommendation in this case.

**H.  The District Court did not Abuse its Discretion by Remanding the Remaining Issues to State Court**

"It is within the district court's discretion to exercise supplemental jurisdiction after dismissal of the federal claim." Quinn v. Ocwen Fed. Bank FSB, 470 F.3d 1240, 1249 (8th Cir. 2006). However, "[w]here, as here, resolution of the remaining claims depends solely on a determination of state law, the Court should decline to exercise jurisdiction." Farris v. Exotic Rubber and Plastics of Minn., Inc., 165 F. Supp. 2d 916, 919 (D. Minn. 2001) (citing Baggett v. First Nat'l Bank, 117 F.3d 1342, 1353 (11th Cir. 1997)); see also Gregoire v. Class, 236 F.3d 413, 420 (8th Cir. 2000) (stating that "[t]he judicial resources of the federal courts are sparse compared to the states. We stress the need to exercise judicial restraint and avoid state law issues wherever possible.") (quoting Condor Corp. v. City of St. Paul, 912 F.2d 215, 220 (8th Cir. 1990)). In deciding whether to remand a case in this context, the courts consider

[7](...continued) recommendation. See Webb, 840 F. Supp. at 1518. Since neither party has addressed this issue, and since its resolution is not necessary to the outcome of this case, we will assume without deciding that a specialist providing an abbreviated briefing may, in some circumstances, have a duty to provide a VNR recommendation.

"factors such as judicial economy, convenience, fairness and comity." <u>Quinn</u>, 470 F.3d at 1249.

The district court in this case specifically mentioned the factors listed in <u>Quinn</u>, and determined that remand was appropriate. We agree. This court's analysis of the United States's liability will not materially affect the remaining issues which involve state-law claims between non-diverse parties. Further, this court has not addressed those state-law claims, so it will not unduly burden the state court if we remand those issues back to the state court.

## III. Conclusion

For the foregoing reasons, we AFFIRM the district court's grant of summary judgment for the United States, and its decision to remand the remaining issues to the Minnesota state courts.

_____